DONALD A. GALE *v.* GREATER WASHINGTON
SOFTBALL UMPIRES ASSOCIATION ET AL.

[No. 258, September Term, 1973.]

*Decided November 30, 1973.*

482

The cause was argued before ORTH, C. J., and MORTON and GILBERT, JJ.

*Thomas F. Santer*, with whom were *Ashcraft & Gerel* on the brief, for appellant.

*William L. Kaplan*, with whom were *Feissner, Kaplan, Smith, Joseph & Greenwald* on the brief, for appellees.

ORTH, C. J., delivered the opinion of the Court.

It did not take long for DONALD ALAN GALE to discover that being a baseball umpire is not without hazards. Even if, like the legendary big-league umpire, he "never called one wrong", a player on one of the teams participating in the game Gale was officiating obviously thought otherwise. This player, who, it appeared, was not even directly involved in the disputed play, attempted to persuade the umpire that the call was missed, and presented his point of view rather forcefully by striking Gale about the neck, hip and leg with a baseball bat, temporarily incapacitating him. Gale believed that his disability resulted from an accidental personal injury sustained by him as an employee of the Greater Washington Softball Umpires Association (GW) and that the injury arose out of and in the course of his employment. He sought compensation under the Workmen's Compensation Act from GW. The Workmen's Compensation Commission, upon hearing, found that Gale was an independent contractor and by its order of 7 March 1972, disallowed the claim. Feeling aggrieved by this decision, Gale sought to have it reviewed on appeal to the Circuit Court for Prince George's County. The appeal proceeding was held in that Court on 19 April 1973 before a jury. At the close of the evidence offered by Gale, GW moved for a directed verdict. Maryland Rule 552 a. The Circuit Court, holding that ". . . the Commission was proper

in the exercise of its decision, and that Mr. Donald A. Gale at the time of his injury was acting as an independent contractor and was not subject to be determined as an employee in the sense of Workmen's Compensation Law," granted the motion and "dismissed the appeal." See Rule 552 c. Gale appealed to this Court. Code, Art. 101, § 56 (a). We affirm the judgment.

I

The essential terms of the association of Gale with GW and the nature of the functions arising therefrom are undisputed. The only evidence received in the case was the testimony of Gale, two of his "pay slips" and the Constitution and By-laws of GW.

At the time of Gale's injury, GW was a "non-corporate association",[1] affiliated with the International Federation of Amateur Softball Association Umpires of the Amateur Softball Association. According to its Constitution and By-laws, its purpose and objective were "to provide trained and qualified softball umpires; to adopt uniform interpretation of the rules as promulgated by the Amateur Softball Association; to encourage the highest ideals of sportsmanship; and to foster and perpetuate the growth of softball." It had six classes of members, of which "active" and "probationary" are here relevant.[2] It was governed by a 13 member Board of Directors composed of and elected by active members in good standing. A person was a "candidate for membership" upon making a written application to the Secretary of GW accompanied by a fee of $5 which covered the expense of an examination and an official rule book. The candidate became a "probationary" member when he passed a written examination, was observed and rated in at least 3 games, which he worked without pay, by a member designated by the Umpire-in-Chief, and was recommended for probationary membership by the Board of Directors. A

---

1. It appears that it was subsequently incorporated in Maryland on 13 August 1971 under the name "Softball Officials, Incorporated."

2. The other classifications were "associate", "honorary", "inactive" and "life."

probationary member remained in that status for the remainder of the softball season in which he was accepted. At the September business meeting, upon recommendation of the Board of Directors, the probationary member could be voted into active membership, be continued for another season as a probationary member, or rejected. To be eligible for active membership, a probationary member had to work a minimum of 20 games for which payment was received. To maintain active status, an active member had to work a minimum of 25 games for which payment was received. Active and probationary members paid dues of $10 a year.

The duties of the Commissioner of GW, who was elected by the members, included contacting all softball organizations to make known the services of GW. He assigned games to active and probationary members, maintained records of games umpired and certified to the Treasurer payment due members for games worked. The Umpires-in-Chief, one for fast pitch and one for slow pitch softball, were elected by the members. They conducted clinic meetings, administered the written examinations and designated the members to be assigned by the Commissioner as observers of probationary members and candidates for membership. The Treasurer issued a statement to all organizations for services rendered, issued itemized statements to members of amounts due them for working games, and paid them. The Business Committee, chaired by the Commissioner, recommended each year to the Board of Directors the schedule of fees to be charged by GW for providing umpires. At the time Gale was injured the fee ranged from $7 to $11. The umpire had the captain of each team in the game he was officiating sign a game slip which was sent to the Commissioner. These fees were paid by GW to the umpire involved, less a 10 per cent assessment of each game fee except American Softball Association (ASA) Regional and National tournaments, and less ASA dues. All active members of GW had to be members of the International Federation of Amateur Softball Association Umpires, the cost of which was paid by the member to the Treasurer. Active and probationary members were covered by an insurance plan selected by GW (not Workmen's

Compensation Insurance, see Code, Art. 101, § 65), the premium to be paid by the member. There was an "official uniform" prescribed by GW to be worn when officiating, the cost of which was also borne by the member.

A member was subject to suspension for missing meetings, for soliciting games from any organization or officiating a game not assigned through the Commissioner's Office or for actions detrimental to the best interest of GW. A member was subject to be fined "the cost of the game" if he failed to cover an assignment or was late for an assignment he had accepted, or umpired "out of uniform." Failure to take a written examination as required was punishable by a fine of $10. The authority to establish, modify or discontinue dues, fees, fines or assessments rested with the membership through amendments to the Constitution and By-laws.

Gale became a candidate for membership in GW early in 1971 by filing an application and paying the $5 fee. He attended training classes two nights a week for six weeks and passed the examination. He umpired two of the three required "observation" games. The third probationary game to which he was assigned was rained out. It seems that as to him the required third game was waived and that he was accepted as a probationary member, because in late April or early May he was assigned games for which he was paid the regular fee. Gale did not know exactly how the amount of the fee was determined. He understood it was based upon the distance of the playing field from the Ellipse in Washington with a minimum fee of $7 and a maximum of $11. At the end of a game a slip was signed by the captain of each team. The slip showed the score and gave the particulars of any unusual happenings. The umpire sent the slip to GW which paid the umpire twice a season. The statement of earnings received in evidence showed that Gale was paid twice in 1971. The statements showed the dates of the games and the fee per game, $9 as to most of them, several at $10 and one at $8. These were the same amounts collected by GW from the teams. GW deducted from the gross amount due Gale, a flat ten per cent, and GW dues,

ASA dues, the cost of a uniform, an insurance premium, (not for Workmen's Compensation) and on the second payment, the amount for two social events and for "an ad in the ad book." There was nothing withheld for social security or income taxes.

Gale testified that the Commissioner's office "would call us and give us usually a week's assignment at a time, sometimes more, but generally a week. As the season progressed, they were giving us like two weeks at a time." He said that an umpire could refuse a game assigned. The court asked if he had a right to say, "I'm not going to umpire the game." Gale replied: "At the time they called us, yes, if there was something we knew of that we had plans for, we could turn it down. As far as turning it down after that, there used to be a statement 'Twenty-four hours before the game, it was yours.' If you didn't call twenty-four hours in advance, after that point it was your game." Presumedly, then if the assigned umpire failed to appear he was subject to fine.

Gale said that a call made by an umpire could be appealed by a team. He explained that there are two types of calls. "One call is a judgment call in which there is really nothing that can be done, and there is an appeal call on various things that happen in the game where the team involved could appeal to the Association (GW)." The appeal would have to be noted at the game. The umpire made an appropriate notation on the "game slip" and notified the President of GW and the Umpire-in-Chief. Gale did not know what procedure was thereafter followed. There was never a hearing as far as he was concerned.

Umpiring, for Gale, was an avocation. He was employed "full time" as a salesman for a Panasonic agency. "I was an outside salesman. My time was pretty much my own, depending on my production and how much money I wanted to make." He could not accept a game on days when sales meetings were scheduled.

## II

Code, Art. 101, § 21 (b) prescribes who shall constitute

employees subject to the provisions of the Workmen's Compensation Act. An independent contractor is not an employee under the section. *Bowers v. Eastern Aluminum Corp.*, 240 Md. 625. The definition of "independent contractor" is not set out in the Act, but " 'Independent contractor' may be defined as one who contracts to perform a certain work for another according to his own means and methods, free from control of his employer in all details connected with the performance of the work except as to its product or result." *Williams Construction Co. v. Bohlen*, 189 Md. 576, 580-581. See *Snider v. Gaultney*, 218 Md. 332, 336; *Uninsured Employers' Fund v. Merritt, et al.*, 13 Md. App. 73, 76-77. Whether the relationship of a person with his employer is that of an employee or that of an independent contractor depends upon the facts of each particular case. *Marine v. Service Trucking Co.*, 225 Md. 315. In discussing the distinction between an employee and an independent contractor, the cases list a number of subsidiary factors that may be considered, see *Keitz v. National Paving Co.*, 214 Md. 479, 491, but stress the right of control and supervision retained by the employer. *Snider v. Gaultney, supra.* To put it in terms of an employer-employee relationship, " [t]he decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.*" *Keitz v. National Paving Co., supra,* at 491. See *Thompson v. Paul C. Thompson & Sons*, 258 Md. 391; *L. & S. Construction Co. v. State Accident Fund*, 221 Md. 51.

## III

It is well settled that "where the terms and manner of employment are disputed and different inferences may be drawn therefrom, the issue as to the relation that existed between the parties is a mixed question of law and fact, to be determined by the trier of facts, under proper instructions [if it be a jury], * * * but where the essential terms and manner of employment are undisputed, the question is one of law for the Court." *Winters v. Payne*, 13 Md. App. 327,

335, quoting *Clayburn v. Soueid, Inc.*, 239 Md. 331, 337. Here, the relationship between Gale and GW was a question of law for the court, the terms and manner of employment being undisputed, and we believe, only one inference drawable therefrom. Applying the decisive test of right of control and supervision retained by GW we think that the court below was correct in determining as a matter of law that Gale was an independent contractor in his relationship with GW with respect to the duties performed as an umpire. We believe that both probationary and active members of GW, as umpires, were independent contractors and not employees. Aside from the other criteria to be considered, see *Charles Freeland & Sons v. Couplin*, 211 Md. 160, which in the factual posture here, support the view that being a member of GW is not consistent with being its employee or servant, we see no such control of an umpire's conduct while officiating a game as to establish an employer-employee status. Although a probationary and an active member were required to work a designated number of games to remain in good standing, neither was obliged to accept a particular assignment. The conduct of the game was in the sole control of the umpire. It is true that he was to abide by the rules of softball, but these rules were not those of GW but were as promulgated by the Amateur Softball Association.[3] GW had no right to control the way he worked the game. In calls he made requiring judgment, it was his judgment alone which governed. The fact that there was a means of appealing disputed decisions did not change the status of the umpire as an independent contractor.

We think that on the undisputed evidence adduced the court below properly found as a matter of law that Gale was within the definition of an independent contractor. We hold that it did not err in granting the motion for a directed verdict in favor of GW.[4]

*Judgment affirmed; costs to be paid by appellant.*

---

**3.** We note that because an "independent contractor" employed to build a house must abide by provisions of a building code does not make him any less an "independent contractor."

**4.** Compare *Daniels v. Gates Rubber Company, et al.*, 479 P. 2d 983 (Colo.

App. 1970), in which under very comparable facts, the Colorado Court of Appeals upheld the reversal of an award by a referee in workmen's compensation against Gates Rubber Company which instituted softball games as part of its recreational program. It held that the umpire obtained from an unincorporated association as here was at best a casual employee of Gates and therefore was not afforded the protection of the Colorado Workmen's Compensation Act. The question of the relationship between the umpire and the Umpire Association of Colorado was not discussed.