John SCHRAMM, et al.

v.

Brian Ashley FOSTER, et al.

Mitchell Thompson, et al.

v.

Brian Ashley Foster, et al.

Nos. Civ. JFM–02–3442,
Civ. JFM–03–2758.

United States District Court,
D. Maryland.

Aug. 23, 2004.

539

**540**

Henry L. Belsky, Schlachman, Belsky and Weiner PA, Baltimore, MD, for Plaintiffs.

Jeffrey Schuyler Getty, Geppert, McMullen, Paye and Getty, Cumberland, MD, for Consolidated Plaintiffs.

Robert T. Franklin, Tamara B. Goorevitz, Franklin and Prokopik PC, Eric R. Harlan, Paul Mark Sandler, Shapiro, Sher, Guinot and Sandler, Baltimore, MD, for Defendant.

## OPINION

MOTZ, District Judge.

Plaintiffs John and Marla Schramm, individually and as guardians of Tyler Schramm, and Plaintiffs Mitchell, Biff, and Dorothy Thompson have brought this action against Defendants Brian Ashley Foster, Groff Brothers Trucking, LLC ("Groff Brothers"), and C.H. Robinson Worldwide, Inc. ("Robinson") for personal injuries suffered by Tyler Schramm and Mitchell Thompson in a motor vehicle accident involving a tractor-trailer driven by Foster. Plaintiffs assert state common law claims for negligence, negligent entrustment, and negligent hiring and supervision, and federal claims under the Motor Carrier Act ("MCA") and Federal Motor Carrier Safety Regulations ("FMCSR"). Now pending before the Court are Robinson's motion for summary judgment and plaintiffs' cross motion for partial summary judgment as to the liability of Robinson.

■ I will deny plaintiffs' motion as to all claims, and I will grant Robinson's motion, except as to plaintiffs' claim for negligent hiring.[1]

### I. Facts
#### A.

This case arises out of a catastrophic accident between a passenger vehicle and a tractor-trailer in Allegany County, Maryland. Foster was transporting a load of soy milk from the warehouse of Jasper Products, LLC ("Jasper") in Joplin, Missouri, to White Rose Food Corporation in Cateret, New Jersey. Foster was an employee of Groff Brothers at the time.

On May 2, 2002, Jasper requested that Robinson arrange for transportation of the soy milk. Robinson made contact with Ronald Groff of Groff Brothers, with whom Robinson had a contract carrier agreement, and Groff Brothers accepted the shipment request. Groff then assigned the job to Foster who was one of his drivers.

---

1. Robinson's motion to strike the reports of plaintiffs' experts is granted. The experts express opinions on legal issues that are for the court to determine.

On May 5, 2002, en route to New Jersey, Foster was traveling eastbound on I–68 in a tractor-trailer when he decided to exit onto Maryland Route 36. Upon reaching the stop sign at the end of the off-ramp, Foster failed to stop or yield the right of way to on-coming traffic and proceeded into the intersection, blocking all southbound lanes on Route 36. Tyler J. Schramm, a minor, was driving southbound in a pick-up truck with Mitchell A. Thompson on Route 36 at the time. Schramm's pick-up truck collided with the tractor-trailer and traveled underneath it until it came to a stop on the other side. The roof of the pick-up truck was severed as it proceeded underneath the tractor-trailer. Foster had been driving in excess of the maximum driving hours allowed by law for operators of property-carrying vehicles.

Schramm suffered neurological damage from which he is not expected to recover. He remains in a semi-vegetative state and suffers from various complications, including seizures, caused by injuries to his brain. As a result of these injuries, Schramm requires assistance with all basic life functions. In addition, Thompson sustained severe and permanent injuries to his head and body.

## B.

Robinson describes its business in the following manner:

C.H. Robinson Worldwide, Inc., together with its subsidiaries and affiliates, is a third party logistics "3PL" company that specializes in brokering the shipment of goods via truck, rail, ocean and air. C.H. Robinson does not own transportation equipment (trucks, trains, ships or aircraft), but instead matches shippers together with carriers that do own and operate such equipment so that commercial goods can be moved efficiently from origin to destination. C.H. Robinson and its affiliates operate over 150 branch offices in the United States and abroad. They brokered approximately 2.8 million shipments in 2002 and 3.2 million shipments in 2003. As part of its motor carrier property brokerage operation, C.H. Robinson has brokerage contracts with more than 20,000 licensed motor carriers, whereby the carriers agree to haul loads for shippers through C.H. Robinson. At the same time, C.H. Robinson markets itself to businesses and manufacturers with transportation needs. With a simple phone call or fax to C.H. Robinson, shippers with transportation needs have ready access to available carriers to haul their loads, and carriers with available trucks can find shippers with goods requiring transportation.

(Def.'s Mem. Supp. Summ. J. at 3.)

Plaintiffs assert, and Robinson does not dispute, that third party logistics companies such as Robinson have emerged in the wake of the deregulation of the trucking industry. Prior to deregulation, independent owner operators typically associated themselves with larger carriers who entered into contracts with shippers, either directly or through brokers. Because of the size of their internal networks, the large carriers could provide integrated services to the shippers. Shippers were able to rely upon the large carriers' quality control monitoring of the independent owner operators (incentivized by the carriers' potential liability) and their established processes for handling freight claims.[2] The carriers also provided excess liability insurance coverage, over and above the required regulatory minimum

---

2. Plaintiffs also contend that the drivers of unionized carriers would also ensure that safety regulations, such as the maximum driving hour rule violated by Foster, were enforced.

(presently $750,000) the independent owner operators were required to carry.

Robinson proclaims that it provides such "one point of contact" service to shippers. It maintains what apparently can fairly be described as a "stable" of small carriers who can pick up loads from one of Robinson's shipping clients at a moment's notice. In the event that the cargo is damaged during transit, "we [Robinson] are the ones to write them [the shipper] the check for the damage if we decide that it is a viable claim. They don't go to the trucking company directly. That's one of the points of being a one point of contact." (Birdwell Dep. at 38–39.) Robinson also addresses the issue of personal injury liability in its promotional materials:[3]

> Just as CHRW [Robinson] takes responsibility for freight claims, we also step forward when liability issues arise. *We insulate the shipper in three important ways:*
> 1. We work only with carriers who carry full insurance coverage. When CHRW begins to do business with a carrier, we verify their insurance coverage and keep a copy in our files of documents that prove the carrier has Federal Operating Authority and a current insurance certificate, with a minimum of $25,000 and $750,000 auto liability coverage. In addition, we check in with carriers regularly to make sure their coverage is current and renewed at necessary levels.
> 2. If an accident occurs, the carrier indemnifies both the shipper and CHRW from liability.
> 3. *In the rare event that the damage goes beyond the carrier's insurance lim-*

*its, CHRW maintains a liability insurance policy that pays the rest.*

(Transport Folio Article, Pls.' Mem. Supp. Summ. J. Ex. 27; *see also* Commercial Umbrella policy Ex. 28.) (Emphasis added).

### C.

Groff Brothers entered into a contract carrier agreement with Robinson on January 26, 2001. Prior to that date, Ronald Groff (one of the Groff brothers), doing business as "RG Transportation," had been a carrier in Robinson's stable of carriers. He had entered into a master transportation contract with Robinson on March 18, 1998, and a contract carrier agreement on November 21, 2000. RG Transportation was originally granted motor common carrier authority by the Federal Motor Carrier Safety Administration ("FMSCA") on January 29, 1998. This authority was voluntarily revoked as of March 13, 2002, and was reinstated on August 20, 2002.

Robinson's contract carrier agreement with Groff Brothers (like its agreements with other carriers) required Groff Brothers to have a "Satisfactory" U.S. Department of Transportation rating. However, Groff Brothers did not have such a rating at the time it entered into the agreement with Robinson because it was a new company. Robinson was aware of this fact by virtue of a response Groff Brothers submitted to a Carrier Information Survey sent out by Robinson.

The FMSCA provides information regarding carriers on several websites and internet pages. This information includes "SafeStat," which reports on and rates carriers' safety performance.[4] "Safety Evalu-

---

**3.** This particular advertisement was not produced until October, 2002, several months after the accident involved here. However, Robinson has not suggested that it is inconsistent with marketing approaches its sales representative took prior to the accident.

**4.** As Robinson points out, a caution page appears before the SafeStat information is accessed. This caution reads as follows:

"**WARNING**

ation Area" values used on this site range from 0 (best) to 100 (worst). According to SafeStat, only SAE ratings of 75 or higher are deemed to be deficient. In September, 2001, Groff Brothers had an SEA rating of 74.00 in the driver safety evaluation area. By March 23, 2002, this rating had decreased to 70.63.

## II. Negligence/Respondeat Superior

### A.

■ Plaintiffs argue that Robinson is liable for Foster's negligence under a respondeat superior theory because Foster acted as an agent of Robinson in the transportation of the Jasper load. Under the doctrine of respondeat superior, an employer is vicariously liable for the tortious conduct of his employee or agent when that employee or agent is acting within the scope of the master-servant relationship. *Schweizer v. Keating*, 150 F.Supp.2d 830, 839 (D.Md.2001); *Hunt v. Mercy Med. Ctr.*, 121 Md.App. 516, 545, 710 A.2d 362 (1998); *Kersten v. Van Grack, Axelson & Williamowsky, P.C.*, 92 Md.App. 466, 469, 608 A.2d 1270 (1992).

■ An agency relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency, § 1(1) (1958). An agency relationship may be established by written agreement or inference. *Patten v. Board of Liquor*, 107 Md. App. 224, 238, 667 A.2d 940 (1995). In this case, there was no written agreement in which Robinson and Foster or Groff Brothers manifestly consented to have Foster act as Robinson's agent. Rather, plaintiffs contend that an agency relation-

ship may be inferred from the circumstances.

■ To establish a principal-agent relationship by inference, plaintiffs must show that 1) the agent was subject to the principal's right of control; 2) the agent had a duty to primarily act for the benefit of the principal; and 3) the agent held the power to alter the legal relations of the principal. *Schear v. Motel Management Corp.*, 61 Md.App. 670, 687, 487 A.2d 1240 (1985), quoting Restatement (Second) of Agency, § 12–14 (1958).

Plaintiffs argue that Robinson asserted its control over Foster under the terms of the contract carrier agreement it executed with Groff Brothers. The contract states that Robinson controls the transportation of freight on behalf of its customers. It further instructs the carrier to obtain instructions concerning the handling of the load, to inspect the goods before loading to ensure that they are in good condition, and to notify Robinson if they are not. According to plaintiffs, pursuant to these provisions, Robinson exercised control when it dispatched Foster, directed him to pick up and deliver the load at specific times, and gave him directions from the Jasper warehouse to the warehouse in New Jersey. Robinson also gave Foster specific instructions regarding the load, including requiring Foster to use load locks on the trailer. Finally, according to plaintiffs, Robinson monitored Foster's performance by requiring him to call when he had successfully picked up the load and then periodically throughout the trip.

However, both the written agreement and the conduct of the parties belie plaintiffs' arguments. The contract expressly

Because of State data variations, FMCSA cautions those who seek to use the SafeStat data analysis system in ways not intended by FMCSA. Please be aware that use of SafeStat for purposes other than identifying and prioritizing carriers for FMCSA and state safety improvement and enforcement programs may produce unintended results and not be suitable for certain uses."

provides that the "relationship of Carrier to Robinson hereunder is solely that of an independent contractor." Pl.'s Ex. 13, Contract Carrier Agreement, ¶ 6. The contract further states that the carrier shall employ all drivers transporting goods under the contract and that "such persons are not employees or agents of Robinson or its Customers." *Id.* Under the terms of the agreement, Groff Brothers was to pay Foster's salary and all expenses incurred in transporting the load and was to provide all necessary equipment and fuel required for the shipment. *Id.* at ¶ 4. According to the contract, "the Parties agree that Carrier shall be the party solely responsible for operating the equipment necessary to transport commodities under this Contract." *Id.* at ¶ 9. Clearly, Groff Brothers and Robinson understood that Groff Brothers was to maintain control of the means and method of transportation, including the performance of the driver.

■■ Moreover, there is no evidence that Robinson controlled Foster's actual performance through its coordination of the shipment. Groff Brothers remained at all times an independent contractor. An independent contractor is "one who contracts to perform a certain work for another according to his own means and methods, free from control of his employer in all details connected with the performance of the work except as to its product or result." *Kersten*, 92 Md.App. at 469, 608 A.2d at 1272 (quoting *Gale v. Greater Washington Softball Umpires Ass'n*, 19 Md.App. 481, 487, 311 A.2d 817 (1973)). The rule of respondeat superior does not impose liability on an employer for the wrongdoing of an independent contractor. *See Brady v. Ralph Parsons Co.*, 308 Md.

486, 512, 520 A.2d 717 (1987); *Rowley v. Mayor and City Council of Baltimore*, 305 Md. 456, 461, 505 A.2d 494 (1986).

The mere fact that Robinson had Foster call Robinson directly to receive the dispatch information, rather than receive it from Groff Brothers does not demonstrate that Foster was under Robinson's control in the performance of his work. Furthermore, although Robinson provided Foster with directions to and from the Jasper warehouse, it explicitly stated that the directions provided were simply for informational purposes.[5] The driving directions and special loading instructions provided by Robinson did not circumscribe Foster's performance to the extent that the details of his performance were precisely determined by Robinson's authority over the transaction. *See Tartaglione v. Shaw's Exp., Inc.*, 790 F.Supp. 438, 441 (S.D.N.Y. 1992) (concluding that the fact that broker controlled the location where cargo was picked up and delivered did not establish an agency relationship because such control involved only the result of the work and not the manner in which it was undertaken).

■■ "Complete control over the result to be accomplished is not enough to make an independent contractor an employee ... '[A]n employer has a right to exercise such control over an independent contractor as is necessary to secure the performance of the contract according to its terms, in order to accomplish the results contemplated by the parties in making the contract, without thereby creating such contractor an employee.'" *Taylor v. Local No. 7, Intern. Union of Journeymen Horseshoers of U.S. and Canada (AFL–*

---

**5.** The Carrier Load Confirmation sent by Robinson to Groff Brothers stated: "Directions supplied by C.H. Robinson or its Customers either orally and/or in written form are for informational purposes only. It is the Carri-

er's sole responsibility to confirm that it may lawfully operate a loaded vehicle of any weight, commodity, or dimension over any highway, bridge or route." Def.'s Ex. 11, Carrier Load Confirmation, at 2.

*CIO),* 353 F.2d 593, 596 (4th Cir.1965) (citation omitted). Thus, the fact that Robinson provided driving directions and required Foster to inspect the load upon pick-up, use load locks, and arrange for the shipment to be unloaded did not destroy Foster's status as an independent contractor; rather, such instructions simply served to secure performance of Robinson's agreement with Jasper according to its terms.

*Professional Communications, Inc. v. Contract Freighters, Inc.,* 171 F.Supp.2d 546 (D.Md.2001), is on point. There, the court considered whether an agency relationship existed between a broker and a carrier hired to transport a shipment of cell phones. As evidence of the agency relationship, the plaintiffs presented a "Driver Trip Sheet" which included a heading with attention to the broker and contained instructions for the driver to report any delays to the broker. *Id.* at 551. The court found that these instructions were consistent with the broker's role and did not indicate a principal-agent relationship. *Id.* The court concluded that "[a] mere contract to ship goods does not establish an agency relationship." *Id.*

 Finally, the fact that Robinson provided Foster with a number to call in case he experienced any problems during the transportation of the load, and Robin-

son's desire to have Foster call periodically to check in do not indicate that Robinson exercised sufficient control over Foster's movements as to make him an agent of Robinson. "Even some reservation of control to supervise the manner in which the work is done, or to inspect the work during its performance does not destroy the independent contractor relationship where the contractor is not deprived of his judgment in the execution of his duties." *Id.; Schweizer,* 150 F.Supp.2d at 840; *Brooks v. Euclid Systems Corp.,* 151 Md.App. 487, 510, 827 A.2d 887 (2003). *See also Schear,* 61 Md.App. at 688, 487 A.2d 1240 (franchisor's right to conduct periodic inspections of franchisee's hotel to assure adherence to quality control standards did not create agency relationship).[6]

### B.

 Even if Foster were deemed to have acted as an agent of Robinson, Robinson would only be liable for Foster's negligence if Foster acted as Robinson's servant in the context of a master-servant relationship. The distinction between an agent and a servant is important because a principal will not ordinarily be liable for the negligence of an agent who is not a servant. *Green v. H & R Block, Inc.,* 355 Md. 488, 509, 735 A.2d 1039, 1051 (1999) (citing *Globe Indem. Co. v. Victill Corp.,*

---

**6.** Plaintiffs also claim that Foster exercised the authority to alter Robinson's legal relations with Jasper when he signed the bill of lading which designated Robinson as "carrier." Foster's signature on the bill of lading is insufficient to establish an agency relationship, however, because Foster was not authorized, either expressly or implicitly, to alter Robinson's legal relations in that manner. The authority of an agent must come from the principal, and the principal must either knowingly permit the agent to exercise the authority or hold out the agent as possessing it. *Integrated Consulting Services, Inc. v. LDDS Communications, Inc.,* 996 F.Supp. 470, 474 (D.Md.1998) (citing *Homa v. Friendly Mobile*

*Manor,* 93 Md.App. 337, 359–360, 612 A.2d 322 (1992)). Although Foster was authorized to sign the bill of lading on behalf of Groff Brothers upon receiving the load, Robinson never expressly authorized Foster or held him out as authorized to legally bind Robinson by signing a bill of lading which, erroneously and without Robinson's knowledge, named Robinson as the carrier. *See Chubb Group of Ins. Companies v. H.A. Transp. Systems, Inc.,* 243 F.Supp.2d 1064, 1070 (C.D.Cal.2002) (where transportation company did not prepare or assist in preparing bill of lading which listed company as "carrier", bill of lading could not be relied upon as basis for imposing carrier liability on company).

208 Md. 573, 581, 119 A.2d 423, 427 (1956)). As the Maryland Court of Appeals explained in *Globe*:

An agent is a person who represents another in contractual negotiations or transactions akin thereto. A servant is a person who is employed to perform personal services for another in his affairs, and who, in respect to his physical movements in the performance of the service is subject to the other's control or right of control. Persons who render service but retain control over the manner of doing it are not servants ... A principal employing an agent to accomplish a result, but not having the right to control the details of his movements, is not responsible for incidental negligence while such agent is conducting the authorized transaction.

208 Md. at 581–82, 119 A.2d at 427.

[15, 16] "One may be an agent of another, owing to his principal the fiduciary obligations of loyalty and general obedience, but at the same time not be sufficiently under the control of the principal to be considered a servant. The relationship of master and servant exists only when the employer has the right to control and direct the servant in the performance of his work and in the manner in which the work is to be done." *Chevron, U.S.A., Inc. v. Lesch*, 319 Md. 25, 570 A.2d 840 (1990). A principal is not liable for any physical injury caused by the negligent acts of his agent, who is not a servant, unless the act was done in a manner authorized or directed by the principal, or the result was one the principal authorized or intended. *Green*, 355 Md. at 509, 735 A.2d at 1051. If Foster was merely an agent rather than a servant of Robinson, Robinson could only be liable for Foster's negligent acts if Robinson authorized or directed Foster to drive in a fatigued condition in excess of his hours.

■ Furthermore, it is not enough that Robinson retain general control over Foster's participation in the transaction. To subject the principal to vicarious liability, "the key element of control, or right to control must exist in respect to the very thing from which the injury arose." *Cutlip v. Lucky Stores, Inc.*, 22 Md.App. 673, 678, 325 A.2d 432 (1974). Thus, unless Robinson had control over Foster's driving time and the condition in which he drove, it will not be vicariously liable for Foster's negligence.

There is no evidence that Robinson directed or authorized Foster to drive in excess of the maximum allowable hours or that Robinson had any control whatsoever of the manner in which Foster conducted his work. Robinson did not have the power to fire Foster or to control his activities in transit. The only thing Robinson had a right to control was the ultimate result— the delivery of the load to its final destination in New Jersey. The fact that Robinson instructed Foster on incidental details necessary to accomplish that goal is not enough to subject Robinson to liability for Foster's negligent acts during the course of the shipment when Robinson had no control over Foster's movements.

### III. Negligent Entrustment

■ Plaintiffs next assert that Robinson is liable for plaintiffs' injuries under a theory of negligent entrustment. According to plaintiffs, Robinson was negligent in permitting Foster to operate a tractor-trailer, which Robinson borrowed from Groff Brothers, when it was foreseeable that Foster might cause harm by driving in a fatigued condition.

■ Under Maryland law, negligent entrustment is defined as: "(1) The making available to another a chattel which the supplier (2) knows or should have known the user is likely to use in a manner involving risk of physical harm to others (3) the

supplier should expect to be endangered by its use." *McGuiness v. Brink's Inc.,* 60 F.Supp.2d 496, 500 (D.Md.1999) (quoting *Wright v. Neale,* 79 Md.App. 20, 28, 555 A.2d 518, *cert. denied,* 316 Md. 508, 560 A.2d 41 (1989)).

Plaintiffs fail to establish a claim for negligent entrustment because Robinson did not supply Foster with a chattel. In order to be considered a "supplier" of chattel, one must have the right to control the chattel. *Broadwater v. Dorsey,* 344 Md. 548, 555, 688 A.2d 436, 439 (1997). The truck Foster used was provided by his employer, Groff Brothers. At no point did Robinson exercise control over the truck or play any part in assigning the load to Foster. The contract carrier agreement expressly required Groff Brothers to provide both the truck and the driver to deliver the load. Thus, Robinson was not a "supplier" of chattel subject to liability for negligent entrustment.

## IV. Claims Under The Motor Carrier Act and The Federal Motor Carrier Safety Regulations

### A.

The first question presented by plaintiffs' claims under the Motor Carrier Act ("MCA") and the Federal Motor Carrier Safety Regulations ("FMCSRs") is whether 49 U.S.C. § 14704(a)(2) creates a private right of action for persons who have suffered personal injuries. That section states: "A carrier or broker providing transportation or services is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part."

At first blush, this language appears to confer a right of action upon any person who has sustained damages as a result of a carrier's or broker's breach of its statutory duties. However, like other courts, *see, e.g., Owner–Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.,* 192 F.3d 778 (8th Cir.1999); *Stewart v. Mitchell*

*Transport,* 241 F.Supp.2d 1216 (D.Kan. 2002); *Renteria v. K & R Transportation, Inc.,* 1999 WL 33268638 (C.D.Cal.1999), I find the language enigmatic. Section 14704(a)(2) stands in stark contrast to the section immediately preceding it, which expressly states that a person injured by virtue of a violation of an order issued by the Secretary of Transportation or the Surface Transportation Board may "bring a civil action to enforce that order."

To the extent the inconsistency in these two provisions warrants examination of the legislative history, that history is instructive in two respects. First, it indicates that the section was intended to apply only to commercial damages, not personal injuries. *See Stewart,* 241 F.Supp.2d at 1221. Second, the history contains no discussion about the impact creation of a federal private right of action for personal injuries would have upon the workload of the federal courts. Because that impact would be substantial, it is reasonable to infer that Congress did not intend to create such a right of action. Thus, I join those courts which have found that section 14704(a)(2) does not create a private right of action for personal injuries.

### B.

Even if section 14704(a)(2) does create a private right of action for personal injuries, plaintiffs' claims asserted under it nevertheless would fail.

#### (1)

##### (a)

Section 14704(a) requires carriers to "provide safe and adequate service, equipment, and facilities." 49 C.F.R. § 395.3 prescribes the maximum driving time allowable for property-carrying vehicles. According to plaintiffs, Robinson is liable under both of these sections because it failed to inquire about Foster's hours of

service and ability to transport the load within the statutory maximum driving time before dispatching him. However, Robinson had no obligation to ensure Foster's compliance with the FMCSRs pertaining to hours of service and driver safety because Robinson was not Foster's employer. 49 C.F.R. § 390.3 states that the regulations "are applicable to all employers, employees, and commercial motor vehicles, which transport property or passengers in interstate commerce." Employer is further defined as "any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate it ..." 49 C.F.R. § 390.5. Robinson does not fall within the scope of this definition.

### (b)

Plaintiffs next contend that Foster was a statutory employee of Robinson because the regulatory definition of employee in 49 C.F.R. § 390.5 encompasses independent contractors hired by motor carriers to transport freight. *See* Pl.'s Reply Ex. 6, Department of Transportation Federal Motor Carrier Safety Regulations Handbook. However, plaintiffs have failed to prove that Robinson acted as a motor carrier in the specific transaction at issue.

Motor carrier is defined in 49 U.S.C. § 13102(12) as "a person providing motor vehicle transportation for compensation." The term "broker" means a "person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). 49 C.F.R. § 371.2(a) further distinguishes motor carriers from brokers: "Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of

this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport."

Plaintiffs claim that Robinson held itself out to Jasper as a carrier and is precluded from being considered a broker with respect to the Jasper load because it offered to arrange the transportation of a shipment which it was authorized to transport and which it accepted and legally bound itself to transport. Plaintiffs point to several factors regarding Robinson's general method of operation and specific conduct in this transaction to support their assertion that Robinson acted as a carrier: (1) Robinson marketed itself as "one-point of contact" which would handle all of its customers' shipping needs; (2) Robinson had FMCSA authority to operate as a carrier; (3) Robinson was listed as the carrier on the bill of lading; (4) Robinson takes responsibility for freight claims and maintains insurance coverage beyond that which is required of brokers; (5) Robinson dispatched the driver; and (6) Robinson has performed carrier services in previous contracts and has an affiliate that holds motor carrier authority. I will address each of these factors in turn.

First, plaintiffs argue that Robinson holds itself out to customers as a carrier because it promotes itself as a comprehensive transportation company that provides for all of its customers' shipping needs and offers them "one point of contact." However, although, as stated infra, *see* section V, I find that this "one point of contact" strategy is relevant to Robinson's common law duty to select carriers with reasonable care, it is not sufficient to convert Robinson into a carrier under federal law.

In *Chubb Group of Ins. Companies v. H.A. Transp. Systems, Inc.*, 243 F.Supp.2d 1064 (C.D.Cal.2002), the court determined

that the plaintiff failed to establish the defendant's status as a carrier rather than a broker despite statements by the defendant's president indicating that the defendant was to arrange for the shipment of goods and would "meet the distinct needs of shippers as it relates to the movement of their goods from point A to point B in their specified amount of time in the time frame they require at the cost that they require." The court concluded that these statements did not indicate that the defendant held itself out as a carrier or represented to the plaintiff that it would transport the goods itself.

In the instant case, Teresa Rhodes, the Jasper employee who coordinated the shipment with Robinson, identified Robinson as a "truck broker", and Edward Beam, president of Jasper, testified that he understood Robinson's role to be that of an "intermediary" that finds trucks and arranges for delivery appointments. Nothing in the record suggests that Jasper believed Robinson was accepting responsibility to ship the load itself pursuant to its motor carrier authority.

 Second, the fact that Robinson had FMCSA authority to operate as a motor carrier is irrelevant to the instant transaction. A transportation entity may have authority to operate as both a broker and a carrier. *Global Van Lines, Inc. v. I.C. C.*, 691 F.2d 773, 774 (5th Cir.1982). The focus of the court's inquiry must be on Robinson's role in the specific transaction with Jasper and the nature of the relationship between Jasper, Robinson, and Groff Brothers. *See Custom Cartage, Inc. v.*

*Motorola, Inc.* 1999 WL 965686, *9 (N.D.Ill.1999); *Phoenix Assur. Co. v. Kmart Corp.*, 977 F.Supp. 319, 326 (D.N.J. 1997) (registration as a broker and failure to register as a carrier are not dispositive of entity's true identity).

Third, the identification of Robinson as the "carrier" on the bill of lading does not prove that Robinson was in fact the carrier in this transaction. In *Chubb*, the court found that an erroneous bill of lading prepared by a third party, which identified the defendant as the "carrier" of the load was insufficient to establish the defendant's carrier status since the defendant played no role in its preparation. 243 F.Supp.2d at 1070. Similarly, the bill of lading here was prepared by Jasper without any involvement by Robinson.[7] In fact, Robinson did not become aware that it was listed as the carrier until after the accident occurred.

Fourth, plaintiffs argue that Robinson's voluntary acceptance of responsibility for freight claims, not imposed upon it by law, and its maintenance of insurance coverage beyond that which is required of brokers shows that Robinson was performing as a motor carrier.[8] However, the fact that Robinson takes responsibility for freight claims does not itself render it liable for personal injuries. It simply does not follow from an entity's voluntary assumption of liability for one type of claim that it is accepting liability for all other claims. Moreover, that fact that Robinson had expanded insurance coverage for its operations conducted under its

---

7. According to Rhodes, the bill of lading was automatically prepared with information in Jasper's computer system. Robinson was identified as the carrier because Robinson was entered into the computer system, for accounting purposes, as the company hired by Jasper to coordinate transportation of the load. Rhodes testified that she did not believe that Robinson was the carrier simply

because it was so identified on the bill of lading. Pl.'s Ex. 5, Rhodes Dep., at 26–27.

8. Robinson does not accept total responsibility for freight claims, as plaintiffs suggest. Its policy is to pay to the shipper what it deems as viable freight claims and then proceed as shipper's subrogee against the carrier with whom it contracted to ship the load.

own motor carrier authority does not mean that it operated at all times under that authority.

Fifth, plaintiffs contend that when Robinson dispatched the driver, it assumed a traditional carrier responsibility and took control of the transportation of the load. However, the fact that Robinson instructed Foster as to the time and place of pick-up and delivery does not amount to an assumption of control as the carrier's dispatcher. In fact, both Foster and Groff Brothers understood that Ronald Groff performed the role of dispatcher in the Jasper transaction. Pl.'s Ex. 12, Foster Dep., at 78; Pl.'s Ex. 18, Groff Dep., at 45. It was Groff, not Robinson, that assigned the load to Foster and had the right to control Foster's route. Foster Dep., at 78. Robinson provided timing, location, and special loading information consistent with its role as a third-party logistics company which had the responsibility of coordinating the shipment of the load in accordance with Jasper's needs.

Finally, the fact that Robinson performed carrier services in previous contracts is irrelevant to determining Robinson's role in the transaction at issue. As discussed above, a transportation entity may possess both carrier and broker authority. The dispositive issue is not whether Robinson had performed carrier services pursuant to previous contracts, but whether, in the specific transaction with Jasper, Robinson chose to use its carrier authority to ship the load or chose to simply broker the shipment to another authorized carrier. Likewise, the fact that Wagonmaster, a Robinson affiliate, holds motor carrier authority bears no relevance to this case. Wagonmaster is a separate entity that played no part in the shipment of the Jasper load.

#### (c)

■■■■■ Plaintiffs also argue that Robinson should be precluded from claiming broker status because it arranged the transportation of a shipment it was authorized to transport as a motor carrier and which it legally bound itself to transport. In other words, plaintiffs assert that because Robinson *could have* transported the load itself as a motor carrier, it should be treated as a carrier because it legally bound itself to transport the load. However, an entity may be considered a motor carrier, as opposed to a broker, only if it engages in solicitation for its own account. *Global Van Lines*, 691 F.2d at 775. Although there is no written contract memorializing the agreement between Jasper and Robinson, plaintiffs have presented no evidence that Robinson engaged in solicitation of the Jasper load for its own account as a motor carrier. Beam testified that he viewed Robinson as an intermediary which would "find trucks and arrange for delivery appointments," Beam Dep., at 131, and Rhodes testified that Robinson provided no other services to Jasper other than arranging transportation of loads. Rhodes Dep., at 46. In sum, there is no evidence that Robinson conveyed to Jasper that it would be transporting the load itself or that it engaged in anything other than "selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

#### (2)

■■■■ Plaintiffs also assert a claim under 49 C.F.R. § 390.13, alleging that Robinson aided and abetted Groff Brothers and Foster in violating the hours of service regulations by failing to inquire about Foster's available driving hours and by prescribing a pick-up and delivery time that would require Foster to drive in excess of his allowable hours.

■■■■ "In the criminal context, a defendant may be found guilty of aiding and abetting only if he has 'knowingly associat-

ed himself with and participated in the criminal venture.' " *Flowers v. Tandy Corp.*, 773 F.2d 585, 590 (4th Cir.1985). The same standard applies in determining aiding and abetting liability in civil cases. *Id.* Association may be proven by establishing that the defendant shared in the principal's criminal intent. *Id.; U.S. v. Horton*, 921 F.2d 540, 543 (4th Cir.1990) (in order to aid and abet, defendant must have participated in the crime as something that he desired to bring about and sought by his actions to make succeed): "Evidence that the defendant 'merely brought about the arrangement that made the criminal acts of the principals possible does not alone support a conclusion that the defendant was aware of the criminal nature of the acts.' " *Flowers*, 773 F.2d at 590 (citation omitted).

In this case, plaintiffs have failed to proffer sufficient evidence establishing that Robinson intended to assist Groff Brothers or Foster in violating the hours of service regulations. While Robinson may have brought about the arrangement that made it possible for Groff Brothers and Foster to violate the regulations, this alone is insufficient to show that Robinson knew that Groff Brothers and Foster would violate the regulations. Robinson's failure to inquire about Foster's available driving hours does not show an intent to assist Foster in exceeding the permissible limit; nor does the time-frame Robinson established for pick-up and delivery of the load. According to Ronald Groff, who accepted the load from Robinson, Foster should have been able to transport the load within that time-frame without violating any hours regulations. Def.'s Ex. 6, Groff Dep., at 64–65.

## V. Negligent Hiring

Maryland law recognizes that an employer may be held liable for negligence in "selecting, instructing, or supervising ... [an independent] contractor."[9] *Rowley*, 305 Md. at 462, 505 A.2d at 497. Although, for the reasons I have stated, I do not believe that Foster can be deemed to be a carrier under federal law, I believe that its self-proclaimed status as a "third party logistics company" providing "one point of contact" service to its shipper clients is sufficient under Maryland law to require it to use reasonable care in selecting the truckers whom it maintains in its stable of carriers.

This duty to use reasonable care in the selection of carriers includes, at least, the subsidiary duties (1) to check the safety statistics and evaluations of the carriers with whom it contracts available on the SafeStat database maintained by FMSCA, and (2) to maintain internal records of the persons with whom it contracts to assure that they are not manipulating their business practices in order to avoid unsatisfactory SafeStat ratings. *Cf. L.B. Foster Co., Inc. v. Hurnblad*, 418 F.2d 727 (9th Cir.1969). These obligations are not onerous, and I do not find that imposition of such a common law duty would be incompatible with the regulations promulgated by the FMCSR. *See* 49 C.F.R. § 355.25 (prohibiting any State law or regulation pertaining to commercial motor vehicle safety which is incompatible with the provisions of the FMCSR); 49 CFR Pt. 355, App. A(2)(b) (state requirements that are more stringent than federal requirements must not "create 'an undue burden on interstate commerce,' e.g., do not delay, interfere with, or increase that cost or the

---

9. To the extent that plaintiffs rely upon a theory that Robinson can be held liable for negligence in hiring Foster himself, I find their position unpersuasive. For the reasons

I have previously stated in discussing other claims, in my view Robinson cannot properly be viewed as Foster's employer or equivalent.

administrative burden for a motor carrier transporting property or passengers in interstate commerce"). To the contrary, imposing a common law duty upon third party logistics companies to use reasonable care in selecting carriers furthers the critical federal interest in protecting drivers and passengers on the nation's highways.

Here, although evidence of Robinson's alleged negligence is somewhat thin, I find it sufficient to withstand a motion for summary judgment. Robinson itself recognizes the importance of a carrier's safety when it requires the carrier to have a "Satisfactory" rating from the U.S. DOT in its contract carrier agreements. While it is true, as Robinson asserts, that generally the breach of a contractual duty does not give rise to a tort claim by a third party, see Brady v. Ralph M. Parsons Co., 327 Md. 275, 282, 609 A.2d 297, 300 (1992), by their very nature contract carrier agreements involve the public interest. Where, as here, one party (Robinson) knows from information provided to it by the other (Groff Brothers) that the latter is in breach of a contractual provision whose very purpose is to protect the safety of innocent third parties, a duty of inquiry necessarily is implied.[10] Likewise, although as Robinson points out, the SafeStat website contains a disclaimer page and although, as Robinson also points out, Groff Brothers did not have an unsatisfactory SafeStat score, its rating was a marginal one. This too implies a duty of further inquiry, and from the existing record it can be inferred that Robinson should have been reasonably alerted to the fact that Groff Brother's provenance was suspi-

cious. Its predecessor, RG Transportation, had experienced a safety performance problem which prompted the formation of Groff Brothers.

Finally, it cannot be ignored that Robinson increased the risk of harm to innocent third parties by its own actions. When seeking business, Robinson advertises to shipper customers that "[i]n the rare event that the damage [caused in an accident] goes beyond the carrier's insurance limits, CHRW maintains a liability insurance policy that pays the rest." Robinson contends that because shippers cannot be held liable for personal injuries caused by a carrier's driver and thus would not care about the existence of excess insurance coverage for such injuries, this promotional statement and ones like it are of no practical effect. I am not willing to take such a cynical view. Responsible shippers are entitled to receive from firms with which they contract honest and accurate information about the insurance available to compensate victims of catastrophic accidents, such as the one involved in this case. It should not be assumed, as implicit in Robinson's argument, that American businessmen and businesswomen are concerned only about saving every nickel and dime and protecting themselves from liability. It is not only government regulators and others in the public sector who have a sense of public responsibility. Moreover, even if business executives engaged only in a cost/benefit analysis, they may very well conclude that the loss to their goodwill resulting from a source of adequate compensation for third parties suffering dreadful injuries in accidents caused by carriers shipping their products far outweighs the marginal increase in cost they must pay

---

**10.** Robinson discounts the importance of the fact that Groff Brothers did not have a DOT safety rating on the ground that Groff Brothers was a new company. Although, as Robinson contends, new carriers should not be foreclosed from the market because they do not have established safety records, it seems entirely reasonable to require firms, including third party logistics companies, who assist newcomers with market entry, to evaluate their safety control measures in the absence of a DOT rating.

for excess insurance coverage to third party logistics companies through whom they arrange their shipments.

In the last analysis, this is a case in which the law may simply have to catch up with an obligation that Robinson has voluntarily assumed, presumably in response to the demands of the market.[11] Although strenuously contesting its liability in these proceedings, in conducting its everyday affairs Robinson apparently recognized the ambivalence of its position and purchased excess liability coverage, both to protect itself and to gain new customers. It has actively interjected itself into the relationship between shipper and carrier, and it has chosen to do business in a context heavily tinged with the public interest. I find the common law imposes upon it a duty commensurate with its undertakings.

A separate order is being entered herewith.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 23rd day of August 2004,

ORDERED that

1. Defendant C.H. Robinson's motion for summary judgment is granted except as to plaintiffs' claim for negligent hiring, and

2. Plaintiffs' motion for partial summary judgment is denied.

**11.** It appears that regulators could assist market forces in furthering sound public policy by requiring that all carriers, at least those carrying loads of a certain weight and/or over a certain distance, have excess insurance for catastrophic accidents. As the facts of this case demonstrate, $750,000 (the present limit of minimally required coverage) is insufficient when such accidents occur. Although independent owner/operators might find the cost of excess insurance too steep, presumably if an excess insurance coverage requirement were in place, the firms with which independent owner/operators associate themselves, be they larger carriers, third party logistics companies, or major shippers who contract directly with small carriers, would provide the excess coverage.