## McKEEL et al. v. MERCER et al.

No. 16316—Opinion Filed May 18, 1926.

1. **Joint Adventures—Definition.**

A joint adventure is a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.

2. **Same—Until Terminated, One Cannot Exclude Associate.**

Until the adventure has terminated or the enterprise has been abandoned, a joint adventurer cannot exclude his associates from an interest in the property by purchasing it for his individual account.

3. **Same—Whether One Holds the Property as Joint Adventurer or Otherwise in Trust for Coadventurer, the Latter Must Comply with Equitable Rule of Tender.**

M. resided upon and had improved under a void title, certain real estate and desired to procure title thereto. J. paid the purchase price to the owners of the land and incurred certain expenses by which he procured conveyance of the land to himself, contending that he did so as a joint adventure with M. for certain royalty interest in the land as his share of the profit and to be reimbursed for outlays, tendering at all times and in the instant action, conveyance of the land to M. according to his understanding of the terms of the adventure. M. denied the joint adventure and that there ever was a personal service contract between them and demanded title of J., refusing compliance with the terms of the adventure, and refusing to tender J. such outlays for the land and expenses. Held, under the maxim that he who seeks equity must offer to do equity, J. is not liable for damages due to delay in conveying the land to M. prior to such tender by M. Held further, that if there was such joint adventure as claimed by J., the latter held the land in trust for M., to be conveyed to M. on tender and payment of such outlays and to have the royalty according to the terms of the adventure: and if there was no joint adventure, under J.'s own contention and conduct, he held the land in trust for M. to be conveyed upon tender and payment of such outlays.

4. **Same—Existence of Relation a Question of Fact—Erroneous Instruction — Disposition of Cause.**

Whether there was a joint adventure on the terms claimed by J., or no contractual relation between the parties, as contended by M., was a question of fact for the jury. Because the court erroneously instructed the jury that the relation of attorney and client existed between J. and M., the judgment is reversed and the cause remanded for new trial under the foregoing rules.

(Syllabus by Estes, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Pontotoc County; Porter Newman, Assigned Judge.

Action by J. F. McKeel et al. against J. W. Mercer et al. Judgment for defendants, and plaintiffs appeal. Reversed, with directions.

J. F. McKeel and Robt. S. Kerr, for plaintiffs in error.

U. G. Winn and King & Crawford, for defendants in error.

Opinion by ESTES, C. Parties appear in the same order as in the trial court, J. F. McKeel being the principal plaintiff, and others nominal plaintiffs. Mercer, the principal defendant, was in possession of 80 acres, purchased by him in 1921 at guardian sale from Catherine Virginia Payne and Consuelo Payne, enrolled Creek freedmen. In April of 1921, Mercer contracted with Westheimer & Daube, of Ardmore, to deliver to them an oil and gas lease on the premises for $4,000 bonus, upon approval of title, the money being placed in escrow in a bank at Ada. The representatives of the lessees submitted the abstract to C. F. Green, an attorney of Ada, and he pronounced the title invalid. Thereafter, they presented the abstract to plaintiff McKeel, an attorney, without the knowledge of Mercer, and he pronounced the title void as to Mercer, and it is so conceded to have been. It is also conceded that the only way to perfect the title in Mercer was by new deeds from the allottees, now sui juris. Thereafter, the agents of the lessees took the defendant Mercer to the office of McKeel, apparently to procure McKeel to perfect title in Mercer. Plaintiff brought this action in ejectment against Mercer, setting up the two deeds from the allottees to McKeel, hereinafter referred to.

Mercer answered the ejectment petition that he had employed McKeel to procure the title, but that plaintiff, through his brother, Dr. Sam McKeel, caused new deeds to be executed by the original allottees to plaintiff, and that such interest as the said McKeel thus obtained, he held as trustee for the defendant Mercer; that McKeel, by procuring said deeds and placing them of record, caused a cloud upon defendant's title, and prevented him from delivering said lease and receiving the said bonus of $4,000; that McKeel's said conduct was a breach of his contract and was the result of conspiracy with his coplaintiffs to cheat and defraud the said Mercer, and damaged de-

fendant in the sum of $4,000 by causing loss of the bonus. Mercer prayed that plaintiff take nothing; that defendant's title be quieted by cancellation of McKeel's deeds, and for damages in the amount of said bonus so alleged to have been lost. In reply, plaintiff pleaded the defendant's title was void and that the oil and gas lease had been rejected because thereof, and averred that he had entered into a contract with the defendants—

"To perfect said title or cure said defects, said contract providing that the said plaintiff, J. F. McKeel, should send his representative to Kansas City to purchase said lands in the name of the plaintiff, J. F. McKeel, the defendant Mercer saying that he did not have the money therefor, and it was further agreed that upon the purchase of said lands and perfection of said title, that the defendant J. W. Mercer would repay to the plaintiff J. F. McKeel all means so expended and accept title to said lands, less one-half of the oil and gas royalty to be retained by the plaintiff J. F. McKeel as a fee for his services, together with one-half of the sale price of said oil and gas lease, which would follow said one-half interest in the said oil and gas royalty."

That he sent his brother, Dr. McKeel, to Kansas City to buy the land, and that defendant Mercer appeared at the home of plaintiff allottees while negotiations were in progress, and denied that the plaintiff's agent represented him, the defendant, and refused to be bound by the contract, and that thereupon, Dr. McKeel, being unwilling to spend plaintiff's money for said lands, arranged with the allottees to attach deeds to plaintiff to a sight draft for $1,000 upon the plaintiff at Ada, which he might take up or reject, and that on the 29th day of April plaintiff paid the $1,000 and accepted the deeds, because the large expense already incurred would be a total loss unless he did so, and that said lands became his absolutely; but that promptly, after acquiring said deeds, he conferred with defendant at plaintiff's office, and informed him that he was ready and willing to carry out the original contract, and that Mercer said he would accept, but that shortly thereafter, defendant came with his wife and his attorney to plaintiff's office and declined. Plaintiff further pleaded other offers on his part and refusals of defendant to accept, and that he had always been and still is ready ready and willing to deed the land to Mercer, less one-half of the royalty, upon payment to him of the cost of the land, $1,232.60, plus interest; that Mercer's refusal to deliver the oil and gas lease had resulted in damage of $2,000

to plaintiff, for which he prayed, as well as for judgment in ejectment.

It seems that the proposed lease covered 100 acres, 20 to 40 acres of which Mercer held by tax deed and as to which plaintiff had told him he could not cure the title. Defendant testified that McKeel said he would straighten up the title for one-half of the royalty on the 20 acres; and that:

"I told him that was a tax title, and I told him I would not give it; I told him I would give him half of the royalty on the 80 acres if he would clear up the title, and he called his wife and says, 'get a contract', and when he began he called it out, and when he got to the 30 or 40 I mean, I says there is nothing doing and I got up and quit him. I got out. That was on Saturday (April 21, 1921), and I had found out that these negroes were in Kansas City somewhere, I didn't know where, and I went immediately up there. * * * and found that McKeel had sent a man up there who had found out where they were."

That defendant went to Kansas City on advice of his attorney, Mr. Winn, after obtaining some money from the bank; that when he and his wife walked into the home of the allottees at Kansas City, Dr. McKeel remained a little while, and "sneaked out" and then the Doctor called defendant and he said, "Didn't you and my brother make a deal on this piece of land?" And I says "No", and he says, "I understood you all made a deal", and I told him, "I had come up to purchase the deed", and he said, "Well, if you need my help, I will be at the hotel," a certain hotel, and I told him, "If I needed him in any way, I would let him know, that I considered that I was up there to attend to my own business"; that defendant left Kansas City on Monday evening, getting back to Ada Wednesday, and noticed that McKeel had filed the deed for record; that McKeel offered to make the deed to defendant without claim on the bonus money, but for one-half of the royalty, and that the next morning when he went in with his wife and attorney, Mr. Winn, that McKeel claimed that the lease was worth more than $50 per acre, and wanted defendant to let him have all he could get above that sum; that he then asked McKeel, "Would you guarantee me $50 per acre?" and he says, "I won't guarantee you nothing," and I says, "Nothing doing"; that McKeel wanted half of the royalty on the 120 acres, and that is what split them up; that later, when the oil boom was over, about a week, McKeel offered to take his money back and one-half of the royalty of the 80 acres, but that he told

McKeel, "I was not doing anything, I was not paying $1,000, that the land has no value for oil and gas purposes now."

The jury returned a verdict in favor of defendant for $1,177.20, but did not set forth the terms of the alleged contract between plaintiff and defendant, as instructed to do. Thereupon. the court rendered judgment quieting title to the land in defendant, and on the verdict for said sum, from which plaintiff prosecutes this appeal.

The only assignment of error necessary to be considered is the instruction of the court that the relation of attorney and client did exist between plaintiff and defendant; that by reason thereof, it was plaintiff's duty to protect defendant with reference to perfecting the title that he was employed to perfect, and that it would be a violation of his duty for the plaintiff to do, or cause to be done, directly or indirectly, any act which would in any way mislead. injure, or deprive defendant of any rights in perfecting the title.

Let it be noted that defendant Mercer pleaded that he employed plaintiff as his attorney to perfect his title, and that in his testimony, he absolutely denies the consummation of such employment; that plaintiff McKeel pleads and contends from his testimony that there was an agreement by which plaintiff was to perfect the title of Mercer simply by procuring new deeds from the allottees, furnishing the money and expenses, to be refunded, and have a part of the royalty as compensation; that the transaction constituted a personal service contract and did not create the relation of attorney and client. It was prejudicial error, under this state of the record, for the court to instruct the jury as matter of law that the relation of attorney and client subsisted. The court took from the jury the question of fact whether a contract had been consummated at all. by instructing that the relation of attorney and client did exist.

The record discloses that Mercer had the advice of his attorney, Mr. Winn, before he went to Kansas City. and had this attorney present in the conference with McKeel upon his return. In 6 C. J. 631, it is said:

"In order to constitute the relation a professional one and not merely one of principal and agent, the attorney must be employed either to give advice upon a legal point, to prosecute or defend an action in a court of justice, or to prepare and draft, in legal form such papers as deeds, wills, contracts, and the like."

It seems clear that the relation of attorney and client did not subsist.

1, 2. If the theory of plaintiff be true as to the contract and its terms, the engagement constituted a joint adventure between the plaintiff and defendant, the profit to plaintiff being part of the royalty after return of his outlay, and the profit to defendant being the land after reimbursing plaintiff's outlay. A joint adventure is a special combination of two or more persons, where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation. 33 C. J. 841. The rights of the parties. inter sese, are to be inferred from the contract and their acts and conduct in relation to the arrangement, under the law of partnership. Dike et al. v. Martin et al., 85 Okla. 103, 204 Pac. 1106; Oklahoma Boiler & Welding Co. v. Minnetonka Lumber Co. et al., 103 Okla. 226, 229 Pac. 1045. Until the adventure has terminated or the enterprise has been abandoned, a joint adventurer cannot exclude his associates from an interest in the property by purchasing it for his individual account. If a joint adventurer, in breach of his duty, or for the purpose of carrying out the joint adventure, purchases the property, his payment will be deemed to have been made for the use and benefit of the joint adventure, and he will be compelled to account to his associate for any profits thus coming into his hands, adjusting costs and expenses. See Dike et al. v. Martin et al., supra, and 33 C. J. 855. The pleading and contention of plaintiff are consonant with these rules.

3, 4. McKeel contends that since Mercer, as shown by his own testimony, repudiated the contract in Kansas City, he was at liberty to buy the land; that it is his absolutely. and not held in trust for Mercer. The rule, that where one party to an executory contract repudiates the same the other is not bound, is not applicable in behalf of McKeel, because under his version of the contract, he and Mercer engaged in a joint adventure. Under the rules aforesaid. and according to the contention of McKeel, corroborated by his numerous offers, made even in his reply in this case. he was recognizing the joint adventure. though not so denominating it. He tried this case on such theory. Under said rule of joint adventure, the purchase of the land by him was for the benefit of the joint adventure. While denying that he had agreed so to do, Mercer does admit that he was willing to give McKeel back his money and one-half of the royalty on the 80 acres, contending that the reason such ar-

rangement was not consummated, was because McKeel demanded royalty on 120 acres. It is undisputed that McKeel paid for the deeds from the allottees and said expenses. If there was no joint adventure, if there was no contract whatever between them, as Mercer testified, nevertheless it was the duty of Mercer to tender McKeel the costs of these deeds and expenses. In the numerous conferences between the parties after McKeel procured the deeds, under Mercer's own testimony, he never did pay or offer to pay said amounts. If there was no employment, as claimed by Mercer, of course Mercer was not bound to tender McKeel any part of the royalty or anything else as compensation for his services. If all Mercer says be true —that McKeel went around him by means of the information gained at the first conference and procured these deeds—Mercer could not thereafter stand by and refuse to reimburse McKeel for his expenditures. He cannot excuse himself in this behalf by the allegation that McKeel recorded the deeds and thereby clouded his title, because Mercer had no title to be clouded. He pleaded in general terms a conspiracy between McKeel and the allottees, whereby he was defrauded, but there is no evidence thereof. It is undisputed that at Kansas City, when Dr. Sam McKeel was negotiating with the allottees for the new deeds and Mercer appeared, the Doctor withdrew from the prosecution of his mission and offered to assist Mercer in procuring these deeds for himself. In this, Mercer failed, and thereafter the allottees made said arrangement with Dr. McKeel, whereby the deeds were sent on sight drait to plaintiff. Therefore, under defendant's own testimony, it was his duty to tender to McKeel these amounts and demand conveyance from McKeel, under the general equitable principles. We look in vain in the answer of defendant for any offer to reimburse plaintiff for such outlays, although defendant alleged that plaintiff held the lands for defendant's benefit. We are holding McKeel, as a joint adventurer under the rules of equity. Defendant is bound by the same code. Pleading and asking equity, he offered not so to do. The maxim that requires one seeking equity to offer to do equity, is still in fashion. Thus, we come to the question, Who is responsible for the loss of the $4,000 bonus? Under Mercer's testimony, the reason McKeel did not convey the land to him immediately upon procuring title, was not that Mercer was unwilling to give McKeel half of the royalty on the 80 acres, but because McKeel demanded greater royalty, and at another time

wanted all he could procure for the lease above $50 per acre. But at no time did Mercer say to him:

"Inasmuch as you have the title to the land to which I had no title and claim to hold such title in trust for me, and I lived upon and made improvements upon and now desire the title to the land, but did not employ you to procure the title for me and therefore owe you no compensation for services, I now tender to you the money which you expended and demand the title you claim to hold for me."

If Mercer had so done and McKeel had refused, then Mercer were in a position to assert that the loss of the bonus, due to the delay in procuring title in himself, was caused by a breach of duty by McKeel. It follows that in no event is Mercer entitled to damages against McKeel for the loss of the bonus. On retrial, the jury should determine whether the contract and its terms were as claimed by McKeel, or whether there was no contract whatever, as testified by Mercer. If the jury so finds for McKeel, and he will plead such tender, defendant is entitled to the land, and McKeel to such royalty or other compensation for services according to the contract as found by the jury, and also his expenditures with interest, to be refunded by defendant and protected by proper liens on the land, exclusive of such royalty as he may have in the land under the contract so found. If the jury determines that there was no contract of employment, as testified by Mercer, then the same relief to each party should be administered by the court, except no compensation in royalty or otherwise would be due McKeel.

Let the judgment be reversed and the cause remanded for new trial not inconsistent with the views herein expressed.

By the Court: It is so ordered.

Note.—See under (1) 33 C. J. p. 841 § 1. (2) 33 C. J. p. 856 § 48. (3) 21 C. J. p. 172, § 151; p. 180 § 162; 33 C. J. p. 868 § 86. (4) 33 C. J. p. 871 § 97. See 15 R. C. L. p. 500; 3 R. C. L. Supp. p. 461; 4 R. C. L. Supp. p. 998; 5 R. C. L. Supp. p. 841.