OPINION BY P. THOMAS THORNBRUGH, CHIEF JUDGE:
¶ 1 Plaintiff, The T. Le, appeals a decision of the district court granting summary judgment to transportation broker Total Quality Logistics, LLC (TQL) on the grounds that TQL was not vicariously liable for the acts of carrier Arora or its driver Gurinder Singh. On review, we affirm the decision of the district court.
*370 BACKGROUND
¶ 2 The case stems from a road accident occurring on Interstate 40 near Mustang, Oklahoma. A semi-truck trailer driven by one Gurinder Singh, an employee of carrier Arora, struck the rear of a vehicle in which Plaintiff Le was a passenger, injuring Le. The truck was carrying a refrigerated load of strawberries destined for Wal-Mart. The strawberries were originally consigned to Wal-Mart by a company named Eclipse Berry Farms which was apparently the owner of the cargo. Eclipse Berry Farms had arranged transportation for the strawberries through "transportation broker" TQL. Le sued Singh and Arora for negligence. She also sued TQL on theories of agency, joint venture, negligent hiring and statutory employment.
¶ 3 TQL filed a motion for summary judgment arguing that some of Le's theories failed as a matter of law, and that there was no evidence of at least one required element in her other theories of liability. The district court held a hearing on the motion, and granted summary judgment to TQL. The court certified this matter for appeal pursuant to 12 O.S. § 994.
STANDARD OF REVIEW
¶ 4 When deciding a motion for summary judgment, the district court considers factual matters but the ultimate decision is purely legal. Carmichael v. Beller , 1996 OK 48, ¶ 2, 914 P.2d 1051. Issues of law are reviewed pursuant to the de novo standard of review. Brown v. Nicholson , 1997 OK 32, n.1, 935 P.2d 319. De novo review involves a plenary, independent, and non-deferential examination of the district court's rulings of law. In re Estate of Bell-Levine , 2012 OK 112, ¶ 5, 293 P.3d 964. On review, we examine the pleadings and evidentiary materials submitted by the parties to determine whether there exists a genuine issue of material fact. Carmichael , 1996 OK 48 at ¶ 2, 914 P.2d 1051. If the moving party has not addressed all material facts, or if one or more of such facts is not supported by acceptable evidentiary material, summary judgment is not proper. Spirgis v. Circle K Stores, Inc. , 1987 OK CIV APP 45, 743 P.2d 682 (approved for publication by the Oklahoma Supreme Court).
ANALYSIS
¶ 5 The basic common law rule is that a person who performs work through an independent contractor is not liable for damages to third persons caused by the negligence of the contractor, excepting special circumstances that would place a duty on the hiring party. Hudgens v. Cook Indus., Inc. , 1973 OK 145, 521 P.2d 813 ; Bouziden v. Alfalfa Elec. Co-op., Inc ., 2000 OK 50, ¶ 12, 16 P.3d 450. Le argued at summary judgment that there is evidence of such special circumstances sufficient to create a jury question as to TQL's liability for Singh's and Arora's actions. Le brings 31 allegations of error, but these may be reduced to three basic theories of liability against TQL.
1. TQL is responsible for driver Singh's actions because it, not Arora, was the actual motor carrier, or because it exercised control over driver Singh's actions sufficient to make TQL liable as an employer or principal under a respondeat superior/agency theory.
2. TQL is responsible for driver Singh's actions because it had a duty to investigate Singh/Arora's safety and driving record to a greater degree than it did ("negligent hiring").
3. TQL is responsible for driver Singh's actions because it was in a joint venture relationship with Arora.
I. TQL AS A "MOTOR CARRIER" PURSUANT TO FEDERAL LAW
¶ 6 The essence of Le's first claim is that TQL is legally the "carrier" of the load of strawberries, not a freight broker, and is hence responsible for the acts of driver Singh on a respondeat superior basis. The centerpiece of Le's "carrier" argument is a series of statements by various courts to the effect that any entity that commits to deliver a load is a "carrier" pursuant to federal law.
¶ 7 Le argues that, because TQL committed to Eclipse Berry Farms to deliver the strawberries before hiring Arora, it is a motor *371 carrier and, as a motor carrier, it is responsible for Singh's actions, even though it was not his nominal employer. Indeed, Le argues that any brokerage model in which the broker promises to arrange delivery of a load renders the broker a "motor carrier," and hence TQL is the employer or principal of the driver of every load for which it arranges shipment. The question of when a broker may become a motor carrier is substantially one of federal regulation.
A. The Carmack Amendment
¶ 8 The fundamental problem with Le's argument is that its legal roots come from cases involving a 1906 federal statute known as the Carmack Amendment, 49 U.S.C. § 14706 et seq . The Carmack Amendment is a federal law assigning liability for loss, damage, or injury to property transported in interstate commerce, and preempts state regulation of carrier liability in this area. Adams Express Co. v. Croninger , 226 U.S. 491, 505, 33 S.Ct. 148, 57 L.Ed. 314 (1913) ; Read-Rite Corp. v. Burlington Air Express, Ltd ., 186 F.3d 1190, 1196 (9th Cir. 1999). The Amendment places the responsibility for the loss or damage to such goods on carriers, but not brokers, pursuant to 49 U.S.C. § 14706(a). Chubb Group of Ins. Companies v. H.A. Transp. Systems, Inc ., 243 F.Supp.2d 1064 (C.D.Cal. 2002). As a result, a great deal of case law involving the Carmack Amendment naturally centers on the question of whether a specific entity was a "carrier" or a "broker." We disagree that case law involving lost or damaged goods pursuant to the Carmack Amendment has any relevance to respondeat superior questions in Oklahoma.
¶ 9 Reported Oklahoma cases discuss the Carmack Amendment and associated case law only in this context of liability for lost or damaged freight .[1] We find no Oklahoma authority for the proposition that a status of "carrier" assigned for the purpose of assigning liability for lost and damaged freight renders an entity a "motor carrier" for all purposes of federal transportation regulation, or state respondeat superior claims.
¶ 10 Turning to other states, an identical claim was discussed by a federal district court in the case of Kavulak v. Laimis Juodzevicius, A.V. Inc ., 994 F.Supp.2d 337 (W.D.N.Y. 2014). In Kavulak , plaintiff Kavulak was working as part of a bridge cleaning operation. Kavulak's dump truck was struck from behind by a truck operated by defendant A.V., Inc. Kavulak attempted to hold broker Transportation Solutions Group, LLC liable, alleging that the broker "was acting as a motor carrier under federal law, not a property broker, at the time of the accident and therefore is liable as such." Id . at 342.
¶ 11 The district court in Kavulak rejected the argument that the standards used to determine which entity was the "motor carrier" for the purposes of the Carmack Amendment had any relevance to respondeat superior liability for personal injury caused by the operation of the truck. The court found that "Plaintiff's argument that TSG would be liable if found to be a motor carrier under federal law is therefore meritless." Id . at 344. Kavulak further noted that the Carmack Amendment "does not create a private right of action to recover for personal injuries sustained by a motorist struck by a tractor-trailer driver."[2]
¶ 12 Similar principles are stated in *372 McGinn v. JB Hunt Transport, Inc. , No. 10-cv-610-JPS, 2012 WL 124401, *3 (E.D.Wis. Jan. 17, 2012).[3]
[T]o expand Carmack Amendment preemption to cases in which a plaintiff seeks to hold a carrier liable, not for damage or loss of the goods, but rather for personal injuries allegedly caused by the carrier's negligence in the transport of those goods, would seem to be at odds with both the plain language of the statute and the purpose behind its enactment.
¶ 13 These decisions appear rational and properly related to the purpose of the Carmack Amendment, which is to give a shipper the "right to proceed against the initial carrier in a case where damage or loss occurred while the shipment was in the hands of a subsequent carrier" and preempt state laws to the contrary. Aaacon Auto Transp., Inc. v. State Farm Mut. Auto. Ins. Co ., 537 F.2d 648, 653 (2d Cir. 1976).
¶ 14 We further note that, even if TQL, which owns no trucks and employs no driver or owner-operators, did somehow become a "motor carrier," it still hired another motor carrier (Arora) to actually move the load. At least one case, Harris v. Velichkov , 860 F.Supp.2d 970, 979-80 (D. Neb. 2012), indicates that if a motor carrier hires a second motor carrier to actually move the freight in question, it is the second carrier that is liable for the driver's actions. We find that case law determining what entity is a "carrier" for the purpose of assigning liability for lost or damaged freight has, however, no relevance to the question of respondeat superior liability before us, and reject, as matter of law, Le's argument that TQL is a "motor carrier" for the purposes of liability for personal injuries.
B. Federal Statutory Employee Doctrines
¶ 15 Le's counsel also argued during the hearing of the summary judgment motion that federal law makes any entity that hires an independent contractor to haul freight "responsible for the independent contractor." This argument is evidently a misapprehension or attempted extension of the federal doctrine making a holder of a federal motor carrier license that leases equipment from independent owner-operators to move freight the statutory employer of the operators for respondeat superior purposes.
¶ 16 After deregulation, motor carriers developed a practice of leasing equipment and services from independent owner/operators. See Prestige Cas. Co. v. Michigan Mut. Ins. Co ., 99 F.3d 1340, 1342 (6th Cir. 1996). Carriers historically used such leasing arrangements "to avoid safety regulations governing equipment and drivers" by moving the burden of regulatory safety compliance to the "independent" owner/operator. Id. (citing American Trucking Ass'ns v. United States , 344 U.S. 298, 304-05, 73 S.Ct. 307, 97 L.Ed. 337 (1953) ). The same practice created "public confusion as to who was financially responsible for the vehicles" and attempted to shift the potential tort liability for vehicle accidents inherent in a motor carrier business away from the carrier and onto the independent owner/operators. Prestige Cas. at 1342.
¶ 17 In response to such abuse, Congress amended the Interstate Commerce Act to allow the Interstate Commerce Commission to promulgate regulations governing all aspects of non-owned equipment used by authorized carriers. See Ste. Marie v. Midwest Freightways, Inc ., 2007 WL 3244671, at *2 (W.D. La. Nov. 2, 2007). Those regulations are known as the Federal Motor Carrier Safety Regulations, 49 C.F.R 350-399. The regulations require a lease between an authorized carrier and an equipment owner to provide that "the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1). This doctrine does not apply to the current situation, however. We find no evidence that Singh was an independent owner/operator, or that he leased any equipment to TQL. An entity hiring a carrier to transport freight is not responsible for the independent contractor absent other circumstances. We find no *373 legal basis for Le's claims that TQL was Singh's actual employer.
II. AGENCY
¶ 18 Le also seeks to hold TQL liable for Singh's actions based on more traditional agency principles. As a matter of general Oklahoma law, the existence of a principal/agent relationship is determined by considering the actual intent and effect of the contract's language in light of the parties' actual day-to-day conduct vis-a-vis one another. Wathor v. Mut. Assur. Adm'rs, Inc ., 2004 OK 2, ¶ 6, 87 P.3d 559. The label used by the contracting parties to define their relationship does not alone determine whether they in fact stand vis-à-vis one another in a principal/agent relation.[4] Id. The essence of a principal/agent status is the principal's power to give directions and the agent's duty to obey them. If a right of control is present, a principal/agent relationship may be found and the tort doctrine of respondeat superior liability invoked. Id. Beyond the general statement however, we find no Oklahoma case examining these principles in the context of agency liability for the acts of a driver nominally employed by a federally licensed interstate carrier.
¶ 19 Le relies heavily on the Illinois case of Sperl v. C.H. Robinson Worldwide, Inc ., 408 Ill.App.3d 1051, 349 Ill.Dec. 269, 946 N.E.2d 463 (2011). That case denies an appeal of a jury verdict finding that a principal/agent relationship existed between logistics company CHR and the driver of a vehicle employed by carrier Dragonfly. Were the facts in the current case at all similar to those in Sperl , a jury issue of "control" would clearly exist. Sperl, however, is of little advisory value because the degree of control exerted by the broker over the driver in that case was extraordinary, including the power to fine the driver for violations of numerous instructions.[5] As the Sperl court noted,
Critical facts that are present in our case were not present in either Jones or Schramm.[6 ] Here, CHR owned the product being transported and the load was being delivered to a CHR warehouse. Moreover, CHR imposed fines on Henry to ensure she maintained CHR's schedule during the trip. CHR's special instructions included the potential for multiple fines and forced Henry to violate federal regulations *374 in order to avoid them. These facts support the inference that CHR controlled the details of Henry's operations, schedule and compensation. (Footnote added).
¶ 20 Most critically, the Sperl court noted that these policies created a significant incentive for drivers to exceed the allowed hours of service to avoid fines, and hence the policies had a direct impact on road safety and may have been a proximate cause of the accident. Id ., 349 Ill.Dec. 269, 946 N.E.2d at 469.[7]
¶ 21 By comparison, none of the crucial facts apparently relied on in Sperl are present in the current case. The "controls" over driver Singh identified by Le's expert are as follows:
(1) must have good air chute; (2) must have an air-ride trailer; (3) must pre-cool the trailer to 34 degrees; (4) temperature must be maintained at 34 degrees continuously for the entire trip; (5) driver must pulp product after each pick-up; (6) driver cannot load product unless it is between 34 and 36 degrees; (7) carrier must provide receipt for any unloading; (8) carrier must provide receipt for gate fees; (9) driver must make sure that a temperature recorder is placed in the refrigerated trailer, (10) driver must not leave without placing a temperature recorder in the trailer; (11) if the truck isn't a full load, call the office; and (12) make sure the pallet count is correct.
¶ 22 In addition, Plaintiff's expert, Mr. Corsi, noted several instances of "control" that appear to have no connection to driver Singh at all, including contractual requirements that the "carrier wave all rights against the shipper" and some form of a "non-solicitation clause" forbidding carriers to make direct contracts with shippers for a period after using TQL's services. Corsi further noted that TQL represented in a web page targeted at potential customers that it "maintained control of the shipment by a detailed dispatch and check call policy" contacting drivers "at least twice a day" to provide status updates.
¶ 23 The substantial factual gap between the "controls" exerted in Sperl and the control in this case is clear. Further, at least eight of the instances of control identified by Mr. Corsi are clear common sense requirements that any shipper of refrigerated products would require before entrusting a load to a carrier or broker.[8] In Scheinman v. Martin's Bulk Milk Serv., Inc ., 09 C 5340, 2013 WL 6467525 (N.D. Ill. Dec. 9, 2013), the judge opined that requirements of call-in reports on a driver's progress does not signify that the shipper has any ability to direct or control the driver's actions in hauling the assigned load. Again this reflects simple common sense. As another Illinois case, Wilson-McCray v. Stokes , 01 C 1929, 2003 WL 22901569, (N.D. Ill. Dec. 9, 2003) notes, a shipper has
an interest in making sure that its customers received their goods in a timely manner; and the fact that it monitored this process to ensure prompt delivery no more creates an agency relationship than does the designation of overnight delivery on a Federal Express package.
¶ 24 If a shipper does not create an agency relationship by such "control," we see no basis to hold that a broker creates an agency relationship by doing the same on behalf of its customers. Further, we note that the Sperl court critically distinguished the situation in that case from other cases where the courts had found the control of a driver insufficient to create an agency relationship. Sperl noted that the control exercised over the driver in that case created a safety hazard by setting an impossible schedule, thereby forcing the driver to violate federal hours-of-service regulations in order to avoid fines.
¶ 25 The best analogue we find is the situation in Holland v. Dolese Co ., 1982 OK 43, 643 P.2d 317. In that case, the Supreme *375 Court held that the only inference which "reasonable men might derive from the evidence is that [the carrier] was an independent contractor and that [driver] was [carrier's] employee, and it was error for the trial court not to have so instructed the jury." The courts in Jones v. C.H. Robinson Worldwide, Inc. , 558 F.Supp.2d 630 (W. D. Va. 2008), and Schramm v. Foster , 341 F.Supp.2d 536 (D. Md. 2004) are in accord that the degree of control presented in this case did not create an agency relationship.
III. NEGLIGENT HIRING
¶ 26 Le's next theory of liability was one of negligent hiring. The elements of negligent hiring in Oklahoma are set out in N.H. v. Presbyterian Church (U.S.A.) , 1999 OK 88, ¶ 20, 998 P.2d 592. Employers may be held liable for negligence in hiring, supervising, or retaining an employee. Id . In such instances, recovery is sought for the employer's negligence. Id. The claim is based on an employee's harm to a third party through employment. An employer is found liable if the employer had reason to believe that the person would create an undue risk of harm to others. Id . Employers are held liable for their prior knowledge of the servant's propensity to commit the very harm for which damages are sought. Id.
¶ 27 In this case, we are not dealing with the direct hiring of the individual employee (Gurinder Singh) who caused the harm. TQL had no actual knowledge of Singh's existence or his role in transporting the load until after the accident. Le claims that that TQL erred in contracting with Singh's employer, Arora, to move the load of strawberries. The general rule in Oklahoma is that a person who performs work through an independent contractor is not liable for damages to third persons caused by the negligence of the contractor except where the work is inherently dangerous or unlawful or where the employer owes a contractual or defined legal duty to the injured party in the performance of the work. Hudgens v. Cook Indus., Inc. , 1973 OK 145, 521 P.2d 813 ; Bouziden v. Alfalfa Elec. Co-op., Inc ., 2000 OK 50, ¶ 12, 16 P.3d 450. We find neither exception applicable in this case.[9] However, entities hiring an independent contractor may be liable for damages to third persons caused by that contractor if the entity fails to exercise "due care in selecting a competent contractor for the necessary work." Hudgens , id. The question on summary judgment in this case was, therefore, whether any reasonable juror could find that TQL failed to use due care in selecting Arora as a contractor.
A. Actual Knowledge
¶ 28 As noted by Holland v. Dolese Co. , 1982 OK 43, 643 P.2d 317, the situation in Hudgens was that of an owner-operator "hauling wheat while driving at an excessive speed on wet pavement in an overloaded tractor-trailer which had no speedometer, defective brakes, deficient springs, threadbare tires," in a vehicle ... "in such poor mechanical condition that it would be unsafe to drive even if unloaded." The facts in this case are far less dramatic than those in Hudgens . We find no facts indicating that TQL had actual knowledge that Arora might be an incompetent contractor.
¶ 29 The undisputed facts are that TQL had used Arora on over 500 previous occasions between its first contract with TQL in 2014 and the 2016 accident, and TQL had received no previous reports of any related collisions or injuries. Arora was, at the time it was hired to transport the load in question, a federally licensed motor carrier carrying $1,000,000 in liability insurance. Its federal motor carrier safety rating was, at the time of hire, "Unrated." Under this regulatory framework, a motor carrier may be "unrated," meaning that "a safety rating has not been assigned," or be rated "satisfactory," "conditional," or "unsatisfactory." 49 C.F.R. § 385.3. An "[u]nsatisfactory safety rating *376 means a motor carrier does not have adequate safety management controls in place to ensure compliance with the fitness safety standard." Id.[10] Chhetri v. United States , 1:14-CV-975-ODE, 2014 WL 12116029, at *1 (N.D.), aff'd , Chhetri v. United States , 823 F.3d 577 (11th Cir. 2016). TQL's standard contract further required a carrier to notify TQL if it received an unsatisfactory rating. We find no evidence that TQL had actual knowledge of any alleged unfitness of Arora as a contractor.
B. Constructive Knowledge
¶ 30 Le's claim is essentially that, had TQL conducted more active investigation into Arora, and the driver assigned to deliver this particular load, it would have determined either that Arora was not a competent contractor in general, or was not a competent contractor in this particular instance because of the driver Arora assigned to the load. Regarding the alleged duty of TQL to further investigate Arora's general competence, Le relies on the testimony of her expert, Thomas M. Corsi. Mr. Corsi opined that a broker is required to conduct an independent safety investigation of any carrier that is "unrated" pursuant to the federal motor carrier safety rating system.
¶ 31 Corsi's authority for this statement is the "guidelines" issued by a group known as the "Transportation Intermediaries Association" (TIA). The TIA is evidently a private membership organization that seeks to provide "leadership and direction for the [third party logistics] industry and professionals to advance professional standards, business practices and the overall image and credibility of the profession and its ultimate contribution to society."[11] We find only two reported cases in the U.S. mentioning the TIA. One case - Ass'n of Indep. Prop. Brokers & Agents, Inc. v. Foxx , 5:15-CV-38-OC-30PRL, 2015 WL 4393729, at *2 (M.D. Fla. July 15, 2015) - accused the TIA of lobbying for higher security requirements for the property-broker industry in order to "drive new and smaller brokers out of the broker industry." The second, Dragna v. A & Z Transp. , CIV.A. 12-449-SDD-RL, 2014 WL 5801515, at *1 (M.D. La. Nov. 7, 2014), involves a motion in limine to exclude part of a report by Mr. Corsi.[12] We find no citation of these TIA "guidelines" in any published case law from any U.S. jurisdiction, and certainly no case finding that these "guidelines" embody legal standards of duty, or constitute admissible evidence. We decline to give them such status in Oklahoma.
¶ 32 Le also cites an unpublished trial court opinion, Ramos-Becerra v. Hatfield , 1:14-CV-0917, 2016 WL 4127387, at *1 (M.D. Pa. Aug. 3, 2016), as approving of an extensive list of duties proposed by another plaintiff's expert. That opinion dealt with a motion in limine challenge to the admissibility of the expert's opinion, not any issue of law or fact within the underlying case. Parts of the expert's opinion were quoted in the order, but we do not view this as an endorsement of the principles contained therein. We find this case distinguishable, and find no legal rule in the Pennsylvania trial court's opinion that is of any relevance to the current inquiry.
¶ 33 Le further cites a federal trial court opinion in Schramm v. Foster , 341 F.Supp.2d 536, 551 (D. Md. 2004), as a source of case law in support of her argument. One particular section of Schramm is the lynchpin of Le's case, and we must examine it in some detail. In Schramm , a district judge declared in a summary judgment inquiry that:
I believe that [defendant's] self-proclaimed status as a "third party logistics company"
*377 providing "one point of contact" service to its shipper clients is sufficient under Maryland law to require it to use reasonable care in selecting the truckers whom it maintains in its stable of carriers.
¶ 34 To that degree ("reasonable care in selection") Schramm appears to be in accord with Oklahoma common law. The trial judge in Schramm then went on, however, to opine that the duty to
"use reasonable care in the selection of carriers includes, at least, the subsidiary duties (1) to check the safety statistics and evaluations of the carriers with whom it contracts available on the database maintained by FMSCA, and (2) to maintain internal records of the persons with whom it contracts to assure that they are not manipulating their business practices in order to avoid unsatisfactory SafeStat ratings. (Footnotes omitted).
¶ 35 Ignoring the internal inconsistency in the statement (there is a duty to check SafeStat records in order to hire competent contractors, but the SafeStat records are not reliable because they may be manipulated), our own review of case law indicates that the district court in Schramm attempted to create a considerably broader and more onerous duty than is generally accepted by any precedential court, and did so without any evident authority. Schramm implies by citation that the 9th Circuit had previously approved its statement of duties in the case of L. B. Foster Co. v. Hurnblad , 418 F.2d 727, 730 (9th Cir. 1969). L. B. Foster , however makes no reference whatsoever to a duty to check the SafeStat database or any similar index.
¶ 36 In fact, L. B. Foster reached a conclusion somewhat at odds with the pronouncement of Schramm , and the theory urged here. L. B. Foster held that the duty of greater inquiry arose because the cargo in question - 40,000 pounds of steel - was of a weight and character which presented a particularly dangerous operation in comparison to more general transport. Id. at 731. L. B. Foster then applied the Restatement principle that if "the work is peculiarly dangerous unless carefully done" the hirer has a duty to "go further and ascertain the contractor's actual competence." Id . at 732. We find no record facts or precedent indicating that a load of strawberries would fall under the rule expressed in L. B. Foster , and no further authority for the duty declared by Schramm . We are further doubtful that the expansion of the duty required when hiring a federally licensed motor carrier to transport freight proposed in Schramm would be approved of by either the Oklahoma Legislature or the Oklahoma Supreme Court.
¶ 37 Even if we accept, however, the Maryland or federal common law pronounced by the Schramm court as having some validity in Oklahoma, we find no record that any "SafeStat check" would have yielded significant information indicating that Arora was an incompetent contractor. The closest Le comes to showing this necessary fact is the production of two letters sent to Arora by the U.S. Dept. of Transportation. Even assuming that these letters could be obtained by a third party via the SafeStat program, the first notes that, in May 2011(more than five years before the accident in question) Arora showed an apparent lack of compliance with vehicle maintenance regulations. The second is a June 10, 2016 letter noting a "trend of hours-of-service violations" by Arora. This letter was sent only seven days before the accident in question, and we find no evidence that it would have been available to TQL before it agreed with Arora to transport the load in question.
C. The Driver
¶ 38 The true gravamen of Le's claims is that Gurinder Singh, the involved driver, was not competent, and that TQL reasonably could have discovered this before Singh took over transport of the load of strawberries.[13] It appears undisputed that Singh had a poor driving record before he was hired by Arora. An Arora employee stated that he would not have hired Singh had he known this. The record also shows that TQL did not know that Gurinder Singh was driving the load in question. The record indicates that TQL
*378 asked Arora who would be driving the load for contact purposes, and Arora informed TQL that the driver's name was "Laddie." Hence, Le relies on a claim that a broker is required by common law to obtain the full name of any driver that may transport a load and investigate that driver's record before proceeding with any given job.
¶ 39 Le relies on Beavers v. Victorian , 38 F.Supp.3d 1260, 1263 (W.D. Okla. 2014, under Colorado law) for her argument that a broker has a duty to investigate the driving record of any individual driver working for a motor carrier who might move a brokered load. In Beavers, the contractor was a "one man operation" with whom the broker had no previous relationship, and the record showed no inquiry at all into the contractor's fitness. Hence, Beavers stated that:
Assuming Bee-Line had a duty of inquiry, a reasonable jury could find that Bee-Line's efforts were insufficient to decide that Mr. Copeland or Trinity Delivery Service was a competent contractor for the Owens Corning job.
Id. at 1273 (emphasis added).
¶ 40 The only evident relevance of Beavers in this case, however, is that it cites Schramm for the concept of a broker's duty to inquire into the safety record of every individual employee of a licensed motor carrier before allowing the driver to move a load. As we previously noted, the core holding of Schramm lacks any legal authority for its extensive declaration of duty. We decline to adopt its statements as to the duty of a freight broker as representing the law of Oklahoma.
¶ 41 We find no authority for a duty as proposed by Le pursuant to the facts of this case. This is not to say that a duty to investigate may never arise. In Hudgens , the hiring of an owner/operator, who was not evidently federally regulated, at short notice, to haul wheat in an overloaded tractor-trailer which had no speedometer, defective brakes, deficient springs, threadbare tires in a vehicle in such poor mechanical condition that it would be unsafe to drive even if unloaded indicated a duty of inquiry. In Beavers , the contractor was, again, a "one man operation" with whom the broker had no previous relationship, and the broker made no inquiry at all. By comparison, in Holland , 1982 OK 43, 643 P.2d 317, the Court found no "red flags" that would give rise to a greater duty of inquiry. In this case we find no evidence that could give rise to a heightened duty of investigation, and no duty required as a matter of law that was breached. We therefore affirm the decision of the trial court that no jury question as to TQL's "negligent hiring" of Arora existed.
IV. JOINT VENTURE
¶ 42 A joint venture has been defined in Oklahoma as a special combination of two or more persons where in some specific venture a profit is jointly sought without any partnership or corporate designation. LeFlore v. Reflections of Tulsa, Inc ., 1985 OK 72, 708 P.2d 1068. Three elements are necessary to establish the existence of a joint venture:
1) A joint interest in property (the contributions need not be equal or of the same character),
2) An express or implied agreement to share profits and losses of the venture,
3) Action or conduct showing cooperation in the venture.
Id.
¶ 43 A profit jointly sought in a single transaction by parties is the chief characteristic of a joint venture. Commercial Lumber Co. v. Nelson , 1937 OK 607, 181 Okla. 122, 72 P.2d 829. The profit accruing, however, must be joint and not several , otherwise every person, firm, or individual who performed work or labor in connection with a project might be termed joint adventurers, whether they had any such intention or not. Id . It is indisputable that TQL and Arora both sought to make a profit from their activities. As Commercial Lumber implies, in any relationship in which a contractor hires a subcontractor to perform part of a project, each party intends to make some profit from the arrangement. Not all contractor/subcontractor or broker/contractor transactions are joint ventures, however. If the underlying facts are disputed, the existence of a joint venture ordinarily presents a question for *379 determination by the trier of fact, the jury, or the court as the case may be. Sigma Res. Corp. v. Norse Expl., Inc ., 1992 OK CIV APP 160, 852 P.2d 764, citing McKeel v. Mercer , 118 Okla. 66, 246 P. 619 (1926).
A. The Expert Report Does Not Show Questions of Fact Regarding a Joint Venture
¶ 44 The question on summary judgment is, therefore, whether Le showed any facts, disputed or not, evidencing each required element of a joint venture in the TQL/Arora agreement. Le argues that summary judgment is inappropriate because her expert, Mr. Corsi, opined that there was a joint venture.[14]
¶ 45 A party opposing summary judgment must present evidence, not mere contentions, justifying a trial on the merits. American Nat. Bank and Trust Co. of Shawnee v. Clarke & Van Wagner, Inc. , 1984 OK CIV APP 37, 692 P.2d 61, citing Weeks , 554 P.2d 780. If the undisputed facts propounded by the moving party show an entitlement to summary judgment, the burden moves to the non-moving party to show that a dispute of fact exists. Reeds v. Walker , 2006 OK 43, 157 P.3d 100.
¶ 46 Although Fed. R. Evid. 704(a) has long been modified to allow an expert to testify as to "ultimate issues," and Oklahoma has followed this path, experts "may not testify to the legal implications of conduct." Montgomery v. Aetna Cas. & Sur. Co ., 898 F.2d 1537, 1541 (11th Cir. 1990). The bulk of Mr. Corsi's report does little but "testify to the legal implications of conduct." It follows a format in which established case facts are listed, and Mr. Corsi then opines as to the legal consequences of those facts in a manner that requires no expertise beyond that of a judge or jury looking at the same facts .[15] If a court finds the undisputed facts insufficient to demonstrate a joint venture as matter of law, the fact that the opposing part presents a contrary "expert legal conclusion" has no effect. We find no demonstration in Mr. Corsi's report of a disputed question of fact on this issue, and will not consider his opinion as to the legal implications of the facts.
B. Joint Profit
¶ 47 Setting aside the expert opinion, one element of a joint venture that is in dispute appears to be whether there was a joint profit agreement (an express or implied agreement to share profits and losses of the venture), rather than separate profits taken by TQL and Arora. The record shows as a matter of law that the initial transaction began as a several, not joint profit deal. TQL arranged to transport the load of strawberries for approximately $7,500 and then contracted with Arora to transport the load for approximately $6,500. TQL's profit is determined by the difference between these prices. Arora's profit is determined by the difference between its costs and the approximate $6,500 contract price negotiated with TQL. Arora may make a profit or loss on the contract, and TQL's profit is not affected. If TQL cannot find a carrier to move the load at the price it had guaranteed its client, it may take a loss, while the carrier makes a profit. As a matter of law, these profits are clearly several, not joint. This transaction is identical to the common situation in which a general contractor charges a customer one price for work, and then subcontracts the work at a lower price.
¶ 48 Le claims that a joint profit is evidenced by what happened after the accident. The record indicates that the final purchaser of the strawberries (Wal-Mart) rejected some 65 cases of strawberries from the load because the packaging was damaged. Eclipse Berry Farms then deducted $1,106 from the TQL contract price of $7,550 to account for these damaged goods. Le argues that this single fact, however, evidences a joint rather than several profit agreement. In fact, it *380 evidences the opposite. If there was a joint profit agreement, this loss would have been shared by TQL and Arora by agreement. We find no evidence of the joint profit element required by Oklahoma law for a joint venture. The district court did not err in its summary judgment on this question.
V. SANCTIONS
¶ 49 As her final allegation of error, Le appeals the refusal of the district court to award sanctions for an alleged failure of a TQL employee to answer truthfully in a deposition. The decision to deny sanctions is not generally an appealable order. Conterez v. O'Donnell, 2002 OK 67, ¶ 7, 58 P.3d 759 ("the denial of discovery-related sanctions is not considered final until the district court litigation comes to an end.") Because, however, our decision on appeal leaves no claim against TQL, the litigation has "come to an end" concerning TQL. Hence, we may review the denial of sanctions. See Brown v. Curtis, 2003 OK CIV APP 47, ¶ 21, 71 P.3d 34, citing Hammonds , 1996 OK 54, 917 P.2d 6.
¶ 50 A trial court's ruling on a request for sanctions will not be disturbed absent a demonstrated abuse of discretion. Payne v. DeWitt, 1999 OK 93, ¶ 18, 995 P.2d 1088. To reverse for abuse of discretion, this Court must determine that "the trial judge made a clearly erroneous conclusion and judgment, against reason and evidence." State ex rel. Moshe Tal v. City of Oklahoma City , 2002 OK 97, 61 P.3d 234. The appellate court "abides the presumption the lower court decision on the sanction question is legally correct and cannot be disturbed unless contrary to the weight of the evidence or to a governing principle of law." Id .
¶ 51 The alleged sanctionable behavior in this case is that TQL employee Alex Zugelter first testified under oath that certain technical requirements placed on the shipping of the refrigerated strawberries originated with Eclipse Berry Farms, and later testified that he did not know where the requirements originated. At one point, Zugelter answered "yes sir" when Le's counsel asked if "someone told you to address these requirements as customer requirements, they told you to that [sic] in this deposition today, haven't they?"
¶ 52 The district court's legal analysis, and our legal analysis, is clear that the requirements did not create a sufficient degree of "control" to create an agency relationship, irrespective of where the requirements originated. Hence, any alleged perjury by Zugelter had no effect on the case. We find that the court's refusal to award sanctions was within its discretion.
CONCLUSION
¶ 53 In this case, TQL satisfied its initial burden on summary judgment by showing that, absent special facts, it was not Gurinder Singh's employer, and that Arora was nominally an independent contractor. The burden then shifted to Le to show facts that would create a jury question as to her theories of vicarious liability. Le's arguments that Carmack Amendment case law or federal statutory employee doctrines rendered TQL a "motor carrier," and hence Singh's employer, fail as a matter of law. We find the evidence of control in this case insufficient as a matter of law to create a principal/agent relationship. We further note that, unlike in Sperl , 408 Ill.App.3d 1051, 349 Ill.Dec. 269, 946 N.E.2d 463 (2011), the alleged control exercised by TQL was not a possible proximate cause of the accident.
¶ 54 Le's negligent hiring claim is based on specific duties announced in the case of Schramm 341 F.Supp.2d 536 (D. Md. 2004). We find no evidence that the opinion expressed in Schramm reflects any current consensus or past case law establishing the duties that it proposed. Nor do we find that Schramm reflects the current law in Oklahoma, or any proper extension thereof. Le's joint venture claim fails because there is no evidence of the element of a joint, rather than several profit that is required by Oklahoma law.
¶ 55 One of the bedrock principles of statutory and regulatory interpretation is to avoid interpretations that would produce absurd results, see e.g. Griffin v. Oceanic Contractors, Inc ., 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), and Le's construction of the relevant regulations and case law would, *381 in many cases, reverse the existing legal situation and lead to absurd results. As proposed by Le, a shipper, broker, or end customer who specifies normal business requirements such as when a load is picked up or delivered, or asks a driver to stay in touch and update them on the status of the load, runs the risk of a jury holding them to be a motor carrier or driver employer. Even a shipper of refrigerated produce requiring a refrigerated truck, or requiring the driver to check the load's temperature, exerts an unacceptable degree of control pursuant to Le's theories. The law recognizes a separation between brokers and carriers, and this could be destroyed if a broker cannot communicate normal business requirements to a carrier without also becoming a carrier.
¶ 56 Further, in Le's construct, the degree of control over driver selection that she insists is necessary to avoid liability on a negligent hiring theory likely creates liability on an agency theory because of excessive control. To accept this construct would represent a judicial re-writing of the law to create a general liability of brokers for the actions of carriers. This does not reflect the current law or the evident intent of the involved legislatures.
¶ 57 AFFIRMED .
WISEMAN, P.J., and FISCHER, J., concur.

See J.E. Spencer & Associates, Inc. v. Custom Airmotive, Inc., 1988 OK CIV APP 8, 761 P.2d 1297 (aircraft engine damaged during shipment); Underwriters at Lloyd's of London v. N. Am. Van Lines ., 1992 OK 48, 829 P.2d 978 ; Seetapun v. Illinois-California Exp., Inc ., 1973 OK 160, 518 P.2d 885 (household goods lost or damaged during transportation); Cassidy v. Airborne Freight Corp ., 1977 OK 102, 565 P.2d 360 ; Silver Motor Freight Lines v. Automatic Web Guide Co ., 1952 OK 352, 207 Okla. 390, 249 P.2d 994 (equipment and machinery lost during shipping).

Id. at 333-34, citing Lipscomb v. Zurich Am. Ins. Co ., Civ. No. 11-2555, 2012 WL 1902595, *2-3 (E.D.La. May 25, 2012) ; Crosby v. Landstar, No. Civ. 04-1535-SLR, 2005 WL 1459484, *2 (D.Del. June 21, 2005) ; Schramm v. Foster , 341 F.Supp.2d 536, 547 (D. Md. 2004) ; Stewart v. Mitchell Transport, 241 F.Supp.2d 1216, 1219-21 (D.Kan.2002).

In McGinn, the question was whether a worker injured by falling freight while unloading a trailer could sue the broker for personal injuries, involving a similar argument that the Carmack Amendment made the broker a "motor carrier" for liability purposes and preempted state law.

In this case, the TQL-Arora agreement defines the relationship as one of independent contractors.

In Sperl, the broker sent the carrier an "LCS" confirming the shipment. At the top of the LCS, in bold-face type, it stated: "Driver must call Troy Pleasants for dispatch." Under the subheading "DRIVER SPECIAL INSTRUCTIONS", it listed the following requirements:
"1. Driver must make check calls daily by no later than 10 am CST daily or $50 will be deducted from the rate.
2. Driver must verify package count and/or pallet count being loaded on the truck.
3. Driver may incur a fine of $500 for being a full day late, without any proof of breakdown.
4. Driver may incur a fine of $250 for being late for an appt time.
5. Driver must stay in constant communication with me throughout entire load.
6. Driver may incur a fine, if he does not call, for any of the following reasons
a.) waiting longer than 2 hours for product
* * *
7. Driver must call after each pick up and verify that he is loaded.
8. FAILURE TO NOTIFY FINE: If driver has a 7 am appt for that day of delivery, and has a problem that delays him to make on time delivery, and we do not receive a phone call until after or at the time of the delivery appt:
a.) The carrier will be fined $250
b.) The carrier could also be responsible to cover the loss of sales and cost to cover the customer product for that day.
* * *
9. Driver must pulp all product being loaded on the truck. If pulp temperature is plus or minus 2 degrees from the temperature on the dispatch sheet, driver must call their CH Robinson Representative ASAP.
10. All Drivers must check call the day before delivery no matter what day it is. If the driver is more than 700 miles out at or before 10 CST driver must check call again at 4 PM. Any driver 700 miles out after 10 am CST MUST check call at 4 PM CST, and again at 10 PM CST the * * * before delivery.
* * * Most importantly, the DRIVER must stay in constant communication with Central Product and/or the night crew service."
Sperl, 349 Ill.Dec. 269, 946 N.E.2d at 468.

Jones v. C.H. Robinson Worldwide, Inc. , 558 F.Supp.2d 630 (W.D. Va. 2008) and Schramm v. Foster, 341 F.Supp.2d 536 (D. Md. 2004), two case finding no "control" sufficient to cerate an agency relationship.

"CHR's schedule put pressure on Henry as a driver. Henry stated that, given the amount of time she had to get to Illinois, she would not have been able to deliver the load to the Bolingbrook warehouse within CHR's schedule without violating federal regulations." Id .

A record affidavit from an Eclipse Berry Farms' employee states that the eight instances cited are requirements it places on a carrier of refrigerated goods, although this fact is disputed.

Holland v. Dolese Co. , 1982 OK 43, 643 P.2d 317, indicates that "while the driving of a truck may become a dangerous undertaking under the facts present in Hudgens " it is not generally considered so. See also L. B. Foster Co. v. Hurnblad , 418 F.2d 727, 730 (9th Cir. 1969) (transporting unusual loads that require special skill and techniques, such as 40,000 pounds of steel, may be a dangerous activity).

We note that, at hearing, Le's counsel argued that Arora had an "unsatisfactory" rating at the time of contract, but the trial judge properly noted that "unrated" is not the equivalent of "unsatisfactory."

See TIA website: http://www.tianet.org/TIA/About/About_TIA/Our_Mission/TIAnetOrg/About/About_TIA/Our_Mission.aspx?hkey=20ad4b96-f07f-49a6-8313-4db91d94935c (accessed February 21, 2018).

The court held that "the court is compelled to agree that Dr. Corsi should not be permitted to specifically quantify the group of carriers that should have been considered acceptable or unacceptable based upon their SEA scores or any other measure." Jones v. C.H. Robinson Worldwide, Inc ., 558 F.Supp.2d 630, 654 (W.D. Va. 2008).

The record indicates that Gurinder Singh was not the initial driver who picked the load of strawberries up, but took over driving at some time after the product was loaded.

Curiously, Mr. Corsi's report was not sworn but contained a preamble stating that he would testify under oath to its contents if asked to. A question remains as to whether this complies with 12 O.S. § 2056(E).

By example, see Corsi report p. 4 ("It is my opinion that TQL jointly controlled Singh's operations and activities"); p. 5 ("It is my opinion that TQL engaged in a joint venture; TQL bears direct responsibility for the crash on June 27 2016"); p. 25 (TQL is legally a "motor carrier").