Filed 1/16/26

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| YONGQUAN HU et al., | B342355 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 21STCV07830) |
| v. | |
| XPO LOGISTICS, LLC, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Bradley S. Phillips, Judge.  Affirmed.

Strassburg, Gilmore & Wei, William R. Gilmore and Adam R. Lugo for Plaintiffs and Appellants.

Greines, Martin, Stein & Richland, David E. Hackett and Stefan C. Love, Robert A. Olson; Trachtman & Motu and Kevin L. Henderson; McNeil Tropp & Braun, Jeff I. Braun and Tracy L. Breuer for Defendant and Respondent.

* * * * * *

The employee of a carrier hired by a broker to transport cargo across state lines sued *the broker* for negligence in not protecting him from harm. California law presumes that a person (here, the broker) who hires an independent contractor (here, the carrier) owes no duty of care to the employees of that independent contractor for the injuries those employees suffer while working for the independent contractor. (*Sandoval v. Qualcomm Inc.* (2021) 12 Cal.5th 256, 269, 270 (*Sandoval*).) The trial court granted summary judgment to the broker on this ground. In this appeal, the employee argues that the broker has a nondelegable duty to protect the carrier's employees and that the broker actually exercised control over the carrier's transportation of cargo. Because the undisputed evidence indicates that the broker did not perform any duties of a carrier and did not actually exercise any control over the carrier's transport of the cargo, the trial court correctly determined that there were no triable issues of fact and properly granted summary judgment. We further hold that the test applicable in determining whether a broker is strictly liable for property damage to cargo—which turns on whether the broker holds itself out as a carrier, as set forth in *Essex Insurance Company v. Barrett Moving & Storage, Inc.* (11th Cir. 2018) 885 F.3d 1292 (*Essex*)—is irrelevant to the question of liability for personal injury to an independent contractor's employees under California law. We accordingly affirm the judgment in favor of the broker.

# FACTS AND PROCEDURAL BACKGROUND

## I. Facts

### A. *The accident*

During a rainy night on March 21, 2020, Yongquan Hu (plaintiff) was sleeping in the bunk compartment of a truck while his co-worker was driving the truck on a highway outside of Oklahoma City. Plaintiff and the driver were en route from Sabert Corporation's (Sabert) warehouse in Sayreville, New Jersey to its warehouse in Riverside, California; they were transporting a load of plasticware. At around 10:30 p.m., the driver lost control of the truck, causing it to strike the right side of the highway's barrier wall, lose the trailer, cut across the road, and collide with the inside barrier wall. Plaintiff suffered catastrophic injuries, paralyzing him.

### B. *How the transport was arranged*

#### 1. *Sabert tenders the shipment*

Sabert had tendered a quote for transport of its shipment of plasticware in mid-March 2020.

#### 2. *Sabert relied on XPO to broker transport of the goods*

The tender was accepted by XPO Logistics, LLC (XPO).

XPO is a federally licensed property broker. Thus, at the time of the accident, XPO was authorized to act as a broker between a shipper and a carrier to arrange for the transportation of goods. XPO was not itself licensed or authorized to act as a carrier. XPO did not own any trucks, employ any drivers, or have a maintenance or safety department.

Sabert was one of XPO's existing shipper customers. XPO and Sabert had entered into a "Broker/Shipper Transportation Agreement" in February 2019, with XPO identified as the

3

"broker" and Sabert as the "shipper" who "desires to utilize the services of [XPO] to arrange for transportation of [Sabert's] freight."  The broker agreement provides, as pertinent here, that:

-- *XPO is a broker, not a carrier*.  The broker agreement states that XPO's contractual "responsibility" is "limited to arranging for, but *not* actually performing, transportation of [Sabert's] freight."  (Italics added.)  It also expressly states that XPO is "not a carrier," and is not an agent of the carrier.  Indeed, the broker agreement clarified that Sabert's "insertion" of XPO on any bill of ladings as the "carrier" "shall be for [Sabert's] convenience only and shall not change [XPO's] status as a property broker."

-- *XPO will engage carriers*.  The broker agreement states that XPO will enter into written contracts with carriers for the actual transport of Sabert's goods.

-- *XPO will ensure carrier compliance*.  The broker agreement requires XPO to ensure that its contracts with carriers engaged to transport Sabert's goods include provisions requiring the carrier to indemnify Sabert and XPO, to maintain insurance benefitting Sabert and XPO, and to comply with federal and state laws.  XPO must also "require its [c]arriers to comply" with Sabert's "Transportation Security Policy," which sets forth how Sabert's goods should be protected "throughout the transportation chain," and with Sabert's "OS&D Policy," which sets forth how claims over the quantity or condition of goods delivered will be resolved.

-- *XPO will maintain insurance*.  The broker agreement requires that XPO also maintain several types of insurance, and that Sabert be named as a "Certificate Holder."

4

--      *XPO's liability*.  The broker agreement states that to the extent "loss, damage or delay in the transportation of [Sabert's] property" is caused by XPO's "negligent acts or omissions in the performance" of the contract, XPO's liability to Sabert is limited to $100,000 per shipment.

3.      *XPO hired Alliance as the carrier of the goods*

American Alliance Logistics, Inc. (Alliance) sought out the job XPO was brokering to transport Sabert's freight.

Alliance is a federally licensed motor carrier.  It relies on a team of about nine drivers, who are tested by Alliance for driving safety.  Plaintiff was an employee or independent contractor of Alliance.

Alliance was already one of the carriers XPO relied on in brokering transport of its customers' shipments.  XPO and Alliance had entered into a "Motor Carrier Transportation Agreement" in October 2019, with Alliance identified as the "carrier" and XPO as the "broker" who "desires to engage [Alliance] as an independent contractor to provide transportation."  The carrier agreement provides, as pertinent here, that:

--      *XPO is not a carrier*.  The carrier agreement expressly states that XPO will not "be considered a 'motor carrier' for any purpose in connection with" the contract.  While Alliance is required to "ensure that [its] name is clearly stated as the carrier of record on [a bill of lading]", "[a]ny incorrect identification of [XPO] as a carrier under such [bill of lading] shall not affect [XPO's] status as a property broker nor relieve [Alliance] of its obligations" under the carrier agreement.

--      *Alliance performs the transport*.  The carrier agreement obligates Alliance to "load, transport, deliver and

5

unload all freight specified on each load tender in a timely, safe and secure manner and in accordance with" the contract. Alliance agreed to "have exclusive supervision and control over the operations of [its] [r]epresentatives as well as all vehicles and equipment used to perform its transportation services." The carrier agreement states that XPO is not to be "considered the employer of" any of Alliance's drivers.

-- *Alliance's liability*. The carrier agreement states that Alliance will "assume the liability of a common carrier for full actual loss or damage to goods transported," that liability attaches "from the time of the receipt of the goods by [Alliance] until proper delivery," and that Alliance would be "directly liable" to the shipper.

C. **Transport of Sabert's goods**

In compensation for arranging the transport of its goods, Sabert paid XPO $3,925, which constitutes a "line haul rate"— that is, the cost to move the goods across the country—plus a fuel surcharge. This payment arrangement was in lieu of a brokerage commission to XPO.

On March 19, 2020, XPO sent Alliance a "Load Confirmation" form confirming that Alliance had agreed to perform the actual transport of Sabert's goods. While the form identified Alliance as the "carrier," the bill of lading generated by Sabert identified XPO as the carrier.

Alliance assigned plaintiff and his co-worker as the drivers for the shipment. The two of them selected the route they would take, and Alliance owned and maintained the truck they used. XPO had no role in selecting the drivers, did not pay the drivers, did not own or maintain the truck, and did not specify the route. However, XPO received updates and tracked the progress of the

shipment on software it required the drivers to install. Sabert was not in contact with Alliance or the drivers.

### D. *Aftermath of the accident*

Alliance notified XPO about the accident, and XPO—consistent with its role of being "in the middle" between the shipper and carrier—informed Sabert. XPO arranged for Sabert's goods "to be repalletized and loaded onto another trailer" for transport to Sabert's Riverside warehouse. A different Alliance truck and driver completed the transportation.

Sabert was ultimately compensated $12,003.54 for damage to its goods, with XPO paying half that amount itself and its insurer paying the other half. Later, XPO deducted "[e]ither $1,000 or $2,000" from Alliance's compensation for the transport.

## II. Procedural Background

### A. *The complaint*

Plaintiff sued XPO on March 1, 2021.[1] In the operative first amended complaint, plaintiff asserted, as pertinent here, a cause of action for negligence against XPO based on allegations that XPO "controlled" the rig as well as "the operation" of Alliance's business as a carrier, and allegations that XPO was "acting as" a carrier with respect to the transport of Sabert's goods and, as such, it owed a "nondelegable duty" to ensure the safety of plaintiff's workplace.[2]

---

1    The suit was also brought by plaintiff's wife.

2    Plaintiff also asserted a cause of action for negligent hiring against XPO. The trial court granted summary judgment for XPO on that claim, and plaintiff does not challenge that ruling on appeal.

In addition to the claims against XPO, plaintiff asserted causes of action for (1) strict and negligent products liability

## B. *Motion for summary judgment*

XPO moved for summary judgment. It argued that because it was a licensed broker, it did not owe a nondelegable duty to plaintiff that is owed only by a licensed carrier and did not otherwise have "control" over Alliance's transportation of Sabert's cargo. In opposition, plaintiff urged that XPO had a nondelegable duty and also exercised control over the shipment. Plaintiff also introduced a plethora of evidence aimed at raising triable issues regarding factors governing a carrier's liability for damaged goods under bailment principles. That evidence included (1) 180 other bills of lading showing that XPO was listed as the "carrier" for Sabert's shipments in 2019 and 2020, and (2) an expert's declaration opining that XPO was a carrier.[3] Following XPO's reply brief with objections to the declaration, and a hearing, the trial court issued a ruling on October 16, 2024, granting summary judgment for XPO.

The trial court ruled that the nondelegable duty doctrine did not apply because "there [was] no triable issue of fact whether XPO acted as a carrier or broker: it acted as a broker." The court relied on (1) XPO's license as a broker, and not as a carrier, (2) the language of the broker agreement and the carrier agreement unambiguously limiting XPO to the role of a broker,

---

against the manufacturers of the truck, (2) negligence against Alliance and the driver of the truck, and (3) negligent hiring against Alliance. Those claims and parties are not at issue in this appeal.

[3]     Plaintiff also claimed that XPO was acting as Alliance's agent, but the trial court rejected that theory in its summary judgment ruling and plaintiff does not pursue that theory on appeal.

notwithstanding the bills of lading, and (3) the absence of any evidence indicating XPO's "right to control [Alliance's] day-to-day operations." The court also sustained the objections to the expert declaration proffered by plaintiff.

### C. *Appeal*

Following the entry of judgment for XPO, plaintiff timely filed this appeal.

## DISCUSSION

Plaintiff's negligence claim against XPO rests on XPO's failure to maintain a safe working environment for him.[4] It is undisputed that plaintiff was an employee or independent contractor of Alliance (and we will resolve that conflict in plaintiff's favor by assuming he was an employee), that Alliance is a licensed carrier, that XPO is a licensed broker (and *not* a licensed carrier), and that XPO hired Alliance as an independent contractor to transport freight for Sabert. Thus, the question before us is whether there is a triable issue of fact as to whether XPO owed plaintiff—as the employee of an independent contractor that XPO hired to be a carrier—a duty to ensure a safe working environment.

## I. Pertinent Law

### A. *Summary judgment*

Summary judgment is appropriate when the moving party (usually the defendant) shows it "is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) The moving party bears the initial burden of disproving an element of the plaintiff's prima facie case; if it carries that burden, the burden shifts to the opposing party (usually, the plaintiff) to demonstrate

---

[4] Plaintiff has not appealed the trial court's judgment dismissing his claim against XPO for negligent hiring.

9

the existence of a triable issue of material fact by producing "substantial responsive evidence." (*Id.*, subds. (o)(2) & (p)(2); *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163; *Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 500.)  Although we liberally construe the evidence before the trial court in support of the party opposing summary judgment and resolve all doubts concerning the evidence in favor of that party (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717; *Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39), we review de novo an order granting summary judgment (*California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1087) as well the more specific legal question of whether a defendant owes a plaintiff a duty of care (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 57-58).

    **B.**    ***Duties of care under tort law to an independent contractor's employees***

    In California, there is a "strong" "presumption" that the hirer of an independent contractor owes no duty of care to the employees of that independent contractor for the injuries they suffer while working for the independent contractor.  (*Sandoval*, *supra*, 12 Cal.5th at pp. 269-270; *SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 594 (*SeaBright*); *Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518, 524; *Privette v. Superior Court* (1993) 5 Cal.4th 689, 693.)  This presumption has two primary justifications.  First and foremost, the independent contractor in this situation "ordinarily control[s] the manner of their own work" (*Sandoval*, at p. 269), leaving the hirer with no "right [to] control" that work (*Privette*, at p. 693, quoting *Green v. Soule* (1904) 145 Cal. 96, 99; *Hooker v. Department of Transp.* (2002) 27 Cal.4th 198, 213 (*Hooker*)), such that the hirer is

10

viewed as "implicitly delegat[ing] to the contractor any tort law duty [the hirer might otherwise] owe[] *to the contractor's employee*s to ensure the safety of the specific workplace" (*SeaBright*, at pp. 594, 600). Second, the employee in this situation is already covered by the independent contractor's workers' compensation insurance, so there is no policy justification for allowing additional recovery against the hirer; indeed, courts have reasoned that "it is ordinarily unfair to let [the independent contractor's] worker recover from the hirer for the contractor's negligence."[5] (*Sandoval*, at p. 270; *SeaBright*, at p. 600; *Tverberg*, at p. 525; accord, *Ruckman v. Ag-Wise Enterprises* (Dec. 3, 2025, F086037, F086187) __ Cal.App.5th __ [2025 Cal.App.LEXIS 869, *22-*23] (*Ruckman*).)

This presumption, while "strong," is not irrebuttable. Two exceptions to its application are pertinent here: (1) when the hirer *cannot* delegate its duty of care because that duty to ensure a safe workplace is nondelegable (*SeaBright*, *supra*, 52 Cal.4th at pp. 600-601); or (2) when the hirer *elects* not to delegate its duty of care and instead retains control over the workplace (*Sandoval*, *supra*, 12 Cal.5th at p. 271).[6]

1.    *The nondelegable duty exception*

When the hirer has a nondelegable duty, it cannot "evad[e] responsibility by claiming to have delegated that duty to an

---

[5]    Here, Alliance failed to carry workers' compensation insurance.

[6]    There are other exceptions, such as when the hirer "withhold[s] critical safety information" from the independent contractor (*Sandoval*, *supra*, 12 Cal.5th at p. 271), but these other exceptions are not at issue in this case.

11

independent contractor hired to do the necessary work." (*SeaBright, supra,* 52 Cal.4th at p. 600.) For a duty to be nondelegable, the duty must "preexist" and "not arise from the contract" between the hirer and the independent contractor.[7] (*Id.* at pp. 600-601.) A hirer may owe the employees of the independent contractors it hires a nondelegable duty to maintain a safe workplace if the hirer has been granted a license by a public authority to "engage[] in a 'business attended with very considerable risk'" (*Eli v. Murphy* (1952) 39 Cal.2d 598, 599-600 (*Eli*), quoting Rest.2d Torts, § 428;[8] *Taylor v. Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 604; *Snyder v. Southern California Edison Co.* (1955) 44 Cal.2d 793, 798-799; *Noble v. Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 660-661; *Serna v. Pettey Leach Trucking, Inc.* (2003) 110 Cal.App.4th 1475, 1480, 1484 (*Serna*)) or if the specific terms of a statute or administrative

[7] Plaintiff asserts that this particular aspect of *SeaBright* was not raised by XPO in its summary judgment motion. But *SeaBright* was relied on in the motion and the parties have had sufficient opportunity to address this legal issue in their briefing on appeal. (See *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181 [we may affirm "if the parties have had an adequate opportunity to address" the issue on appeal]; *Noe v. Superior Court* (2015) 237 Cal.App.4th 316, 335-336 [we may affirm a grant of summary judgment on a ground not raised in the trial where the issue "'involves purely a legal question'"].)

[8] Section 428 of the Restatement Second of Torts provides that "[a]n individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity."

regulation obligate the hirer to provide for the employee's safety (*SeaBright*, at pp. 596, quoting Rest.2d Torts, § 424; *Vargas v. FMI, Inc.* (2015) 233 Cal.App.4th 638, 649, 652 (*Vargas*); cf. *SeaBright*, at p. 603 [nondelegable duty reaches only as far as statutory terms provide]).[9]

## 2.     *The retention of control exception*

Even when a hirer's duty of care *can* be delegated, a hirer may still owe the employees of an independent contractor a duty of care to protect against workplace injury (1) if the hirer *chooses to* "retain[] control" over the contracted work by "retain[ing] a sufficient degree of authority over the manner of performance of the work entrusted to the contractor" that "sufficiently limit[s] the contractor's freedom to perform the contracted work in the contractor's own manner," *and* (2) if the hirer "actually exercise[s] that retained control in a manner that affirmatively contribute[s] to the contract worker's injury." (*Sandoval, supra,* 12 Cal.5th at pp. 274-275; *SeaBright, supra,* 52 Cal.4th at pp. 595, 600; *Hooker, supra,* 27 Cal.4th at pp. 202, 210; see also *Ruckman, supra,* 2025 Cal.App.LEXIS 869, *23-*27, *32-*33 [noting that "affirmative[] contribut[ion]" standard applies when injured party is an employee of the independent contractor, but not when it is a third party]; *Alvarez v. Seaside Transportation Services LLC* (2017) 13 Cal.App.5th 635, 641 [duty of care is retained only if "'the hirer [has] engage[d] in some active

---

**9**     Section 424 of the Restatement Second of Torts provides that "[o]ne who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions."

participation'" in the contractor's work that affirmatively contributes to the employee's injury].)[10]  The type of control required is control over how the contractor's work is performed, not merely "'control over the result to be accomplished'" by that work.  (*Schramm v. Foster* (D.Md. 2004) 341 F.Supp.2d 536, 544-545 (*Schramm*).)

**II.    Analysis**

Because plaintiff is the employee of the independent contractor (Alliance) that XPO hired, the "strong presumption" is that XPO does *not* owe plaintiff a duty of care to keep plaintiff's workplace safe from the injury he suffered while transporting cargo.  As a result, XPO owes a duty to plaintiff only if the nondelegable duty exception or retained control exception applies.

**A.    *Nondelegable duty exception***

There is no triable issue of material fact as to whether XPO owed a nondelegable duty to plaintiff.

Because XPO is not a licensed carrier, it does not owe plaintiff a nondelegable duty to ensure workplace safety by virtue of being granted a license by a public authority to engage in a business that involves a "very considerable risk."  To be sure, carriers are engaged in a business that involves a "very considerable risk" of injury (*Eli*, *supra*, 39 Cal.2d at p. 599); consequently, *licensed* carriers have a nondelegable duty to ensure the safety of all persons who they rely upon to transport

---

[10]    Where the injured worker is a third party rather than the independent contractor's employee, it is enough that the hirer "retained control" without the hirer also having exercised that control.  (*Sandoval*, *supra*, 12 Cal.5th at p. 276; *Ruckman*, *supra*, 2025 Cal.App.LEXIS 869, *34-*35.)

cargo, including the employees of independent contractors they hire to transport that cargo. (*Id.* at pp. 599-600 [applying nondelegable duty under Restatement Second of Torts, section 428, to "impose liability upon franchised common carriers who have engaged independent contractors to transport goods over the public highways"]; *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 433; *Serna*, *supra*, 110 Cal.App.4th at p. 1486; *Vargas*, *supra*, 233 Cal.App.4th at p. 662; see also *AmeriGas Propane, L.P. v. Landstar Ranger, Inc.* (2010) 184 Cal.App.4th 981, 984-988.) "Were the rule otherwise, a carrier could escape liability for the negligence of its independent contractors, thus reducing the incentive for careful supervision and depriving those who are injured of the financial responsibility of those to whom the privilege [of a license] was granted." (*Serna*, at p. 1486.) Tellingly, however, a nondelegable duty arises when a hirer is engaged in a dangerous activity only if that hirer is actually licensed by the public authority to engage in that activity. (*Eli*, at p. 598 [carrier was licensed]; *Serna*, at pp. 1486-1487, 1478, fn. 4, 1488, fn. 11 [same]; *Vargas*, at p. 641 [same]; *Gamboa v. Conti Trucking, Inc.* (1993) 19 Cal.App.4th 663, 664 [same].) The cases cited by plaintiff where the hirer was a licensed carrier that outsourced the transport to a third-party carrier's drivers are accordingly inapt here. (See *Serna*, at pp. 1478, fn. 4, 1488, fn. 11; *Vargas*, at pp. 642, 652-653.)[11]

XPO also does not owe plaintiff a nondelegable duty to ensure workplace safety by virtue of any statute or

---

[11] *Crowley Government Services v. GSA* (D.C. Cir. 2025) 143 F.4th 518 is similarly inapt, as it deals with how to distinguish between brokers and carriers for a purpose *other than* assigning tort liability under California law. (*Id.* at pp. 539-542.)

15

administrative regulation.  To be sure, carriers have a number of safety-related duties.  Among them are the rules governing "minimum qualifications for persons who drive commercial motor vehicles as, for, or on behalf of motor carriers" (49 C.F.R. § 391.1-391.69), the rules governing what a "motor carrier, its officers, agents, representatives, and [its] employees" must do when operating motor vehicles (covering everything from what to do at railroad crossings and prohibitions against texting while driving) (49 C.F.R. § 392.1-392.82), the rules governing how the vehicles used by "motor carrier[s]" must be equipped (49 C.F.R. § 393.1-393.209), the rules limiting the hours of service per day for drivers used by "motor carrier[s]" (49 C.F.R. § 395.1-395.38), and the rules governing how vehicles used by "motor carrier[s]" must be inspected and maintained (49 C.F.R. § 396.1-396.25).  Carriers are also required to obtain liability insurance "sufficient to pay . . . for each final judgment against the registrant for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles, or for loss or damage to property."  (49 U.S.C. § 13906(a)(1); 49 C.F.R. § 387.7.)  But these statutory and regulatory duties apply solely to a "motor carrier," which is defined as "a person *providing* motor vehicle transportation for compensation" (49 U.S.C. § 13102(14), italics added), and likely apply only to a *licensed* carrier (because the language of some of the statutory and regulatory duties refer to "registered" carriers).  Again, it is undisputed that XPO is not a licensed carrier.

However, even if we were to adopt the premise of plaintiff's argument that a nondelegable duty may arise even without a license so long as the hirer is *acting* like a carrier, a duty to ensure workplace safety would apply to such a de facto

unlicensed carrier only if it meets the definition of a "carrier"—that is, if it is "providing motor vehicle transportation for compensation" in a way that makes it responsible for the "considerable risk" attendant to that undertaking. It is undisputed that XPO was not in this case. XPO did not perform the transport. The carrier agreement squarely places on *Alliance* all duties attendant to that transport—that is, to conduct all inspections of the trucks, to monitor the drivers, to supply the trucks used for transportation, and to maintain the requisite insurance; the carrier agreement also places on *Alliance* the "exclusive" right and duty to "supervise[] and control[] . . . the operations of [its employees] as well as all vehicles and equipment used to perform . . . the transportation services." This contractual allocation of responsibility satisfied XPO's moving burden on summary judgment. Plaintiff did not provide any contrary evidence sufficient to create a triable issue of material fact on this question—no evidence that XPO had any involvement in selecting, training, or monitoring the drivers of Alliance's trucks; any involvement in inspection or maintenance of the trucks themselves; or any involvement in selecting the trucks to be used, the routes to be driven, or the Alliance employees to drive the trucks. Plaintiff points to the fact that XPO charged Sabert a "line haul" rate plus a fuel surcharge (rather than a brokerage commission), that 180 other bills of lading listed XPO as the "carrier," that XPO acted as the middleman and did not allow Sabert to communicate directly with Alliance, that XPO took responsibility for arranging completion of the transport of Sabert's goods after the accident, and that XPO promised to also maintain insurance. However, none of these facts are *material* to

17

the pertinent question of whether XPO was itself "providing motor vehicle transportation" services.

Thus, XPO did not owe a duty of care to Alliance's employees by virtue of any nondelegable duty because it was not a licensed carrier and because it was not a de facto unlicensed carrier (assuming that such a legal theory is valid).

## B. *Retention of control exception*

There is also no triable issue of material fact as to whether XPO retained control over Alliance's work in transporting Sabert's freight and actually exercised that control in a manner that contributed to plaintiff's injuries. Although the parties in their motions did not cite the pertinent statutory and decisional law regarding the retention of control exception, plaintiff pled XPO's control over the rig and the transport itself, both parties argued in their summary judgment papers over whether XPO "control[led]" plaintiff, the rig, and the transport itself, the trial court understood the issue of control to be at play when it found that XPO lacked any "right to control [Alliance's] day-to-day operations," and the parties continue to debate the issue of control on appeal, including in arguments under separate headings. (Accord, *People v. Scott* (1978) 21 Cal.3d 284, 290 [an issue is preserved "if it fairly apprises the trial court of the issue it is being called upon to decide"].)[12] As explained above, there is no evidence suggesting that XPO retained or actually exercised any control over how Alliance transported the goods. More to the point, XPO neither retained nor actually exercised any control over the safety aspects of that transportation, any deficiencies in which would have contributed to plaintiff's injuries: There is no

---

[12] We accordingly conclude that this theory was squarely presented—and properly addressed by this Court—on appeal.

18

evidence that XPO had anything to do with the safety of Alliance's trucks, Alliance's drivers, or Alliance's internal practices regarding training, inspection or maintenance. At most, XPO exerted control over the result to be accomplished— that is, control over ensuring that the goods XPO brokered for transportation reached their ultimate destination. But, as noted above, that is not enough to rebut the presumption that XPO implicitly delegated its duty of care to the persons who actually carried out the transport when it hired Alliance to transport Sabert's goods.

Plaintiff challenges this conclusion, arguing that there are triable issues of fact as to whether XPO exerted control over Alliance because (1) XPO was obligated under the broker agreement to ensure Alliance's compliance with Sabert's security and OS&D policies, (2) XPO dictated when and where the goods were delivered, and (3) XPO required the drivers to download software for tracking of their movements. Even if we assume that a broker's *obligation* to ensure that the carrier followed the security and OS&D policies of the shipper somehow constituted a retention of control by the broker over the carrier, it is undisputed that XPO never exerted that control because Alliance was never informed of—and, thus, not bound by—Sabert's policies; as noted above, actual exertion of control is required. XPO's direction as to when and where the goods were to be delivered is part and parcel of XPO's role as a broker hired to arrange the transport of those goods. And XPO's act of tracking the progress of a shipment, in addition to being part of a broker's job, is entirely passive; XPO's receipt of tracking data does not constitute an exertion of control. In sum, plaintiff failed to show that any of this evidence constitutes sufficient control by XPO to

19

limit Alliance's freedom to perform its transport work.

## III.  *Essex* **Is Irrelevant**

Following the trial court's lead, the parties on appeal focus most of their attention on whether there is a triable issue of material fact as to whether XPO satisfies the test set forth in *Essex*, *supra*, 885 F.3d 1292, that distinguishes a "broker" from a "carrier."

The issue in *Essex* was the scope of the Carmack Amendment (49 U.S.C. § 14706 et seq.), a part of the Interstate Commerce Act that holds licensed carriers strictly liable for damage to transported cargo.  (*Essex*, *supra*, 885 F.3d at p. 1298; see generally, 49 U.S.C. § 14706(a)(1).)  The question in *Essex* was whether the Carmack Amendment also holds a licensed *broker* strictly liable for damage to cargo that the broker had arranged for a licensed carrier to transport.  *Essex* noted the "blurry" line between the statutory definitions of a "carrier" (one who "provide[s]" transportation) and a "broker" (one who "sell[s]" transportation).  (*Essex*, at p. 1300.)  To resolve what it viewed as an ambiguity, *Essex* looked to the Carmack Amendment's purpose of "achiev[ing] uniformity in rules governing . . . injury or loss to *property* shipped" as well as to "the common law of bailment, which governed the liability of freight carriers in the days prior to enactment of the [Interstate Commerce Act] and Carmack Amendment."  (*Id.* at pp. 1300-1301, italics added.)  These sources—which tended to favor making it easy for the shipper to know who to contact for recompense for damage to the goods during transport—prompted *Essex* to hold that a broker would have the same strict liability as a carrier for damage to cargo if it "[held] itself out as the party responsible for the care and delivery" of that cargo.  (*Id.* at p. 1301.)  Thus, *Essex* looked

to such factors as the label the broker used (e.g., whether it was listed as the carrier on bills of lading), whether the broker maintained insurance for damaged goods, and whether the broker was the main point of contact for the customer shipping the goods.  (*Id.* at p. 1302.)

The *Essex* test is ill suited for use in determining whether a licensed broker is liable for personal injury to a licensed carrier's employees because the *Essex* test focuses on whether the broker holds itself out to the customer shipping the cargo as having overall responsibility for those goods when the proper focus, under the California law set forth above, is whether the broker has a nondelegable duty or otherwise retains control over the transportation and the means of protecting employee safety attendant to that transportation.  *Essex* is an apple to the pertinent law's orange. (Accord, *Schramm*, 341 F.Supp.2d at p. 549 ["the fact that [a broker] takes responsibility for freight claims does not itself render it liable for personal injuries"].)  This is why the various disputes of fact proffered by plaintiff—regarding how XPO was paid by Sabert, how XPO allowed itself to be listed as the carrier on bills of lading, how XPO acted as the middleman between Sabert and Alliance, how XPO arranged for another driver to transport Sabert's goods after the accident, and how XPO maintained back-up insurance—are not *material* to the pertinent question of whether XPO had a duty to safeguard employee safety (rather than a duty to be strictly liable for damaged goods).  (See also, *id.* at pp. 549-550 [holding similar factors irrelevant].)  This is also why plaintiff's heavy reliance on *Nipponkoa Insurance Company, Ltd. v. C.H. Robinson Worldwide, Inc.* (S.D.N.Y. Feb. 18, 2011, No. 09 Civ. 2365) [2011 U.S. Dist. LEXIS 17752] is misplaced because that case involved

21

whether an entity was acting as a broker or as a carrier and, therefore, was liable under bailment principles for damage to shipped goods. Because the expert's declaration submitted by plaintiff in opposition to the summary judgment motion applied the same factors as set forth in *Essex* to opine that XPO acted as a carrier, the trial court did not err in excluding that declaration because it applied the incorrect legal standard and was accordingly irrelevant.[13]

---

[13] The declaration also opined that XPO acted "below the standard of care in selecting [Alliance] to carry" Sabert's cargo, but negligent selection of an independent contractor is not a basis for liability (*Sandoval*, *supra*, 12 Cal.5th at p. 270 [California has "refused to extend liability to hirers even on theories . . . such as negligent hiring of an incompetent contractor"]) and plaintiff has not appealed the judgment dismissing his negligent hiring claim.

## DISPOSITION

The judgment is affirmed.  XPO is entitled to costs on appeal.

**CERTIFIED FOR PUBLICATION**.


_____, P. J.
HOFFSTADT


I concur:


_____, J.
KUMAR\*

---

\*     Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Hu v. XPO Logistics, LLC. (B342355)

Kim (D.), J., Concurring.

      I join the majority opinion with the exception of part II.B of the DISCUSSION.  As the majority notes, there are numerous exceptions to the general presumption in California law that the hirer of an independent contractor owes no duty of care to the employees of that contractor for workplace injuries.  Although plaintiffs pleaded multiple theories of negligence, and the trial court granted summary judgment in favor of defendant on each of them, on appeal, plaintiffs limited their challenge to the court's ruling on their negligence claim based on defendant's status as a motor carrier and the nondelegable duty doctrine under section 428 of the Restatement Second of Torts.  In my view, plaintiffs have not "squarely presented" on appeal the issue of whether defendants owed Hu a nondelegable duty of care under the retention of control exception, a direct liability theory grounded in section 414 of the Restatement.  (*Ruckman v. Ag-Wise Enterprises* (Dec. 3, 2025, F086037, F086187) __ Cal.App.5th __ [2025 Cal.App.LEXIS 869, *23-*27].)  Indeed, plaintiffs discuss control only in the context of the definition of "carrier" under the Carmack Amendment, a definition which we have rejected in part III of the DISCUSSION.  Accordingly, I would follow the "'cardinal principle of judicial restraint'" (*People v. Contreras* (2018) 4 Cal.5th 349, 381) and decline to address any exceptions not framed by the pleadings and expressly challenged on appeal (*Agustin v. Golden Empire Transit Dist.* (2025) 116 Cal.App.5th 426, 438; *Helm v. City of Los Angeles* (2024) 101 Cal.App.5th 1219, 1231).

                              KIM (D.), J.